# EXHIBIT A

FILED

2006 APR 13  AM 11: 06

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1  CHARLES D. STODGHILL, *pro hac vice*
   Email: stodghillc@sec.gov
2  GREGORY N. MILLER, *pro hac vice*
   Email: millerg@sec.gov
3  STEVEN A. SUSSWEIN, *pro hac vice*
   Email: sussweins@sec.gov
4  Securities and Exchange Commission
   Division of Enforcement
5  100 F Street, N.E.
   Washington, D.C. 20549
6  Telephone:  (202) 551-4443
   Facsimile:  (202) 772-9244
7
   LOCAL COUNSEL
8  JOHN B. BULGOZDY, Cal. Bar No. 219897
   Email: bulgozdyj@sec.gov
9  Securities and Exchange Commission
   5670 Wilshire Boulevard, 11th Floor
10 Los Angeles, California 90036
   Telephone:  (323) 965-3998
11 Facsimile:  (323) 965-3908

12  Attorneys for Plaintiff Securities and Exchange Commission

13

14                 **UNITED STATES DISTRICT COURT**

15           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16                        **WESTERN DIVISION**

17  SECURITIES AND EXCHANGE          Case No. **CV06-2247 MRP** *(RZx)*
    COMMISSION,
18                                   **COMPLAINT**
            Plaintiff,
19
         vs.
20
    RAMY Y. EL-BATRAWI,
21  GENESISINTERMEDIA, INC.,
    ULTIMATE HOLDINGS, LTD., ADNAN
22  M. KHASHOGGI, RICHARD J.
    EVANGELISTA, WAYNE BREEDON,
23  and DOUGLAS E. JACOBSON,

24          Defendants.

25

26

27

28

1    Plaintiff Securities and Exchange Commission (the "Commission") alleges:

2    **NATURE OF THE ACTION**

3    1.    Between September 1999 and September 2001, Defendants Ramy Y.

4    El-Batrawi and Adnan M. Khashoggi, with the participation of Defendants

5    GenesisIntermedia, Inc. ("GENI"), Ultimate Holdings, Ltd, Richard J. Evanglista,

6    Wayne Breedon and others, engaged in a scheme to manipulate the stock price of

7    GENI, a now-defunct public company, and misappropriated more than $130

8    million in the process.  El-Batrawi and Khashoggi obtained virtually all of these

9    funds by loaning approximately 15 million shares of GENI stock through Native

10    Nations Securities, Inc. and other broker-dealers to Deutsche Bank Securities

11    Limited ("Deutsche Bank Canada") in exchange for cash.  To facilitate these stock

12    loans, Evangelista, Breedon, and others defrauded Native Nations, Deutsche Bank

13    Canada, and the other broker-dealers by leading them to believe that the loaned

14    shares of GENI stock came from reputable brokerage firms and that they were

15    sending the cash collateral to such broker-dealers.  In fact, most of the stock came

16    from El-Batrawi and Ultimate Holdings, Ltd., an offshore entity controlled by El-

17    Batrawi and Khashoggi, and most of the money was sent to El-Batrawi and

18    Ultimate Holdings.

19    2.    To inflate GENI's stock price, which had the effect of generating

20    additional cash collateral from the broker-dealers under the stock loans, El-

21    Batrawi, Khashoggi, Breedon, and Evanglista engaged in numerous fraudulent and

22    deceptive practices to decrease the supply of GENI stock and increase the demand

23    for the stock, including: (i) taking steps to reduce the supply of GENI stock and

24    maintain control of the float; (ii) promoting a short squeeze without disclosing to

25    GENI shareholders that El-Batrawi and Khashoggi already had effectively sold

26    their stock through the stock loans and were attempting to prevent their stock loans

27    from unraveling; (iii) secretly compensating a financial commentator to tout GENI

28    on television to create demand for the stock; (iv) making false and misleading

1

1  statements in periodic reports filed with the Commission and in press releases

2  issued by the company (with the participation of GENI's chief financial officer,

3  Douglas E. Jacobson); and (v) making thousands of trades through nominee

4  accounts to create the false appearance of widespread investor interest in GENI.

5       3.    During the period of Defendants' manipulative conduct, GENI's stock

6  price increased approximately 1,400%, from a low of $1.67 per share (split

7  adjusted) on September 1, 1999 to a high of $25 per share on June 29, 2001. After

8  the scheme collapsed in September 2001, GENI's stock price plunged to pennies

9  per share and El-Batrawi, Khashoggi, and Ultimate Holdings defaulted on their

10  obligations to repay the money that they had fraudulently obtained from the stock

11  loans. Their default caused several broker-dealers to suffer losses on the stock

12  loans of over $130 million. Ultimately, Native Nations and MJK Clearing, Inc.

13  went out of business, and the Securities Investor Protection Corporation ("SIPC")

14  had to conduct the largest bailout in its history.

15       4.    By engaging in the conduct described above, (i) all Defendants,

16  directly or indirectly, violated the antifraud provisions of the federal securities

17  laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

18  U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934

19  ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

20  thereunder, (ii) GENI violated, directly or indirectly, and El-Batrawi and Jacobson

21  aided and abetted violations of the reporting and books and records provisions of

22  Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and

23  78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20,

24  240.13a-1 and 240.13a-13] thereunder, and (iii) El-Batrawi and Jacobson, directly

25  or indirectly, violated the internal controls and books and records provisions of

26  Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1

27  thereunder [17 C.F.R. §§ 240.13b2-1], and made false representations to, or

28  withheld material information from, GENI's auditors in violation of Rule 13b2-2

1  [17 C.F.R. §§ 240.13b2-2].

2      5.      The Commission seeks a judgment from the Court:  (i) enjoining

3  Defendants from engaging in future violations of the above provisions of the

4  federal securities laws; (ii) requiring Defendants to account for and disgorge, with

5  prejudgment interest, the illegal profits and proceeds they obtained as a result of

6  their actions alleged herein; and (iii) requiring Defendants to pay a civil money

7  penalty.  In addition, the Commission seeks an order against Defendants

8  Khashoggi, El-Batrawi and Jacobson prohibiting from them from serving as

9  officers or directors of any issuer that has a class of securities registered pursuant

10  to Section 12 or 15(d) of the Exchange Act of 1934.

11  **JURISDICTION**

12      6.      This Court has jurisdiction of this action pursuant to Section 22 of the

13  Securities Act [15 U.S.C. § 77v] and Sections 21 and 27 of the Exchange Act [15

14  U.S.C. §§ 78u and 78aa].

15      7.      Defendants, directly or indirectly, have made use of the means or

16  instrumentalities of interstate commerce, or of the mails, or the facilities of a

17  national securities exchange in connection with transactions, acts, practices and

18  courses of business alleged herein.

19      8.      Defendants may, unless restrained and enjoined, continue to engage in

20  acts, practices, and courses of business alleged herein, or in transactions, acts,

21  practices, and courses of business of similar purport and object.

22  **INTRADISTRICT ASSIGNMENT**

23      9.      Assignment to the Western Division is appropriate because the

24  majority of claims and certain of the transactions, acts, practices and courses of

25  business alleged below occurred within the Central District of California, including

26  Los Angeles, County.

27  / / /

28  / / /

3

## **DEFENDANTS**

10.    GenesisIntermedia, Inc., ticker symbol GENI, is a Delaware corporation with its principal office in Van Nuys, California.  During the relevant time, it operated a consumer telemarketing company, shopping mall kiosks and a car rental company.  The company's common stock was registered pursuant to Section 12(g) of the Exchange Act and traded on the Nasdaq National Market System until September 25, 2001, when Nasdaq halted trading to obtain additional information from the company.  Instead of responding to the inquiry, the company voluntarily delisted its stock on January 29, 2002.  Currently, GENI's stock trades sporadically in the over-the-counter market, typically at prices under a penny.

11.    Ramy Y. El-Batrawi, age 44, resides in Los Angeles, California. From GENI's inception until he resigned his positions in October 2001, El-Batrawi was GENI's chief executive officer, president, the chairman of the board of directors, and majority shareholder.

12.    Ultimate Holdings, Ltd. ("Ultimate Holdings") is a holding company organized under the laws of Bermuda.  From approximately September 1997 until November 2000, El-Batrawi was president, director and the sole shareholder of Ultimate Holdings.  In November 2000, Adnan Khashoggi formally assumed El-Batrawi's positions and ownership interest in the company.  However, El-Batrawi continued to direct much of Ultimate Holding's activities and act in concert with it.

13.    Adnan M. Khashoggi, age 70, residence unknown, is a Saudi Arabian national.  Since at least November 2000, he has been president, director and beneficial owner of Ultimate Holdings.

14.    Wayne Breedon, age 54, is a Canadian citizen residing in Aurora, Ontario.  At all relevant times, Breedon was the head of the stock loan department at Deutsche Bank Securities Limited ("Deutsche Bank Canada"), which is based in Toronto.  In April 2002, Deutsche Bank Canada suspended Breedon because of his involvement in the fraudulent scheme alleged herein.  Prior to joining Deutsche

4

1  Bank Canada, Breedon worked with Kenneth D'Angelo and was in charge of RBF
2  International's Canadian office.

3       15.    Richard J. Evangelista, age 71, resides in Florida.  He worked at
4  Native Nations for almost thirty years and, most recently, was the head of its stock
5  loan department.  In September 2001, Native Nations fired Evangelista for entering
6  into the improper stock loan transactions that are the subject of the allegations
7  contained herein.

8       16.    Douglas E. Jacobson, age 59, resides in Los Angeles, California.
9  During the relevant time, he was GENI's chief financial officer and secretary.
10  Jacobson is licensed as a Certified Public Accountant in Florida.

11       **OTHER RELEVANT PERSONS AND ENTITIES**

12       17.    Kenneth Peter D'Angelo, age 62, resides in Edison, New Jersey.
13  During the relevant time, he was president and secretary of RBF International, Inc.
14  In 1983, D'Angelo consented to a permanent injunction prohibiting future
15  violations of the antifraud provisions of the federal securities laws.  In 1984,
16  D'Angelo pled guilty in the Southern District of New York to charges of
17  conspiracy and wire fraud involving a scheme to misappropriate funds from
18  various broker-dealers.  In a 1994 administrative proceeding, the Commission
19  ordered D'Angelo and RBF International to cease and desist from causing
20  violations of the Commission's short tender rule.  In 2003, D'Angelo pled guilty to
21  securities fraud, wire fraud and conspiracy in connection with the conduct alleged
22  herein.  In May 2004, in a related Commission action, D'Angelo and RBF
23  International consented to the entry of a permanent injunction prohibiting future
24  violations of the antifraud provisions of the federal securities laws in connection
25  with the conduct alleged herein.

26       18.    Courtney David Smith, age 54, resides in New York, New York.
27  From February 1990 through the present, Courtney Smith has been the president
28  and chief investment officer of Courtney Smith & Co., which was a registered

1    investment adviser between December 2000 and November 2001. During the
2    relevant time, Courtney Smith frequently appeared on television as a financial
3    commentator, discussing numerous public companies, including GENI. In
4    February 2005, the Commission filed suit in the Central District of California
5    against Smith for violating Sections 17(a) and 17(b) of the Securities Act, Section
6    10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and
7    206(2) of the Investment Advisors Act of 1940 in connection with the conduct
8    alleged herein. The SEC's suit against Smith is pending. In December 2005, in a
9    related criminal case, Smith was acquitted of charges of securities fraud and stock
10   touting.

11        19.   Native Nations Securities, Inc. ("Native Nations") was, during all the
12   relevant times, a registered broker-dealer located in Jersey City, New Jersey.
13   Losses caused by the GENI stock loans alleged herein forced Native Nations out of
14   business in September 2001. In a 1994 administrative proceeding involving
15   D'Angelo and RBF International, the Commission sanctioned Native Nations (then
16   known as Freeman Securities Company) for violating the Commission's short
17   tender rule.

18                              **FACTS**

19   **Background**

20        20.   From its inception until June 1999, GENI was a privately-held
21   telemarketing company controlled by El-Batrawi. On June 14, 1999, GENI made
22   an initial public offering of 2 million shares at $2.83 per share (split adjusted).
23   After GENI's IPO, El-Batrawi owned approximately 2.9 million restricted shares
24   of GENI, or 55% of the total outstanding common stock.

25        21.   Throughout its history as a public company, GENI lost substantial
26   amounts of money. In its annual reports on Forms 10-K for the fiscal years ended
27   December 31, 1999, and 2000, GENI reported net losses of $8,296,550 and
28   $33,530,627, respectively. These losses continued into 2001, with GENI reporting

6

1  a nine-month loss of approximately $119 million in its Form 10-Q for the quarter

2  ended September 30, 2001.  During the course of the fraudulent conduct alleged

3  herein from September 1999 to September 2001, El-Batrawi and/or Ultimate

4  Holdings supported GENI by lending it tens of millions of dollars.

5      22.    In addition to the shares of GENI stock that El-Batrawi held in his

6  name, El-Batrawi also owned and/or controlled millions of shares of GENI stock

7  held in Ultimate Holdings' name.  El-Batrawi had incorporated Ultimate Holdings

8  in Bermuda in September 1997 as his "personal investment/holding company."

9  From September 1997 until November 2000, El-Batrawi was the president,

10  director and sole beneficial owner of Ultimate Holdings.

11      23.    In November 2000, El-Batrawi transferred his interest in Ultimate

12  Holdings to Khashoggi.  Thereafter, Khashoggi was the president and director of

13  record for Ultimate Holdings.  Despite this formal change in ownership, however,

14  El-Batrawi continued to exercise control over Ultimate Holdings, opening bank

15  and brokerage accounts on its behalf and authorizing transactions in its accounts,

16  negotiating and facilitating sales of GENI stock by Ultimate Holdings, arranging

17  for Ultimate Holdings to loan GENI stock as part of the fraudulent conduct alleged

18  herein, and acting as an agent for Ultimate Holdings.  None of the periodic reports

19  or other documents filed with the Commission by GENI or Ultimate Holdings

20  disclosed El-Batrawi's ongoing relationship with Ultimate Holdings.

21      **The Scheme**

22          **Stock Lending Generally**

23      24.    Stock lending is a common practice between legitimate broker-dealers

24  in the securities industry, whereby a broker-dealer lends stock to another broker-

25  dealer in exchange for cash equal to the market value of the stock.  A stock loan

26  transaction provides the lending broker-dealer with a temporary source of

27  financing, i.e., the cash collateral exchanged for the loan of stock, while providing

28  the borrowing broker-dealer with temporary use of stock to fulfill more immediate

1    obligations to complete certain securities transactions.  In exchange for the

2    temporary financing secured by the loan of stock, the lending broker-dealer pays

3    the borrowing broker-dealer an interest rate on the cash collateral, known as a

4    "rebate."

5        25.    A broker-dealer may also borrow stock from one broker-dealer and

6    thereafter "on-lend" some or all of that stock to another broker-dealer.  Such an

7    "on-lend" of stock is known as a "conduit" transaction, and the intermediary

8    broker-dealer earns money on the difference between the rebate received from the

9    lending broker-dealer and the rebate provided to the subsequent borrowing broker-

10   dealer.

11                        **The GENI Stock Loans**

12       26.    The manipulation of GENI's stock price began shortly after the

13   company's June 1999 public offering.  To benefit from the manipulation, El-

14   Batrawi and the other Defendants structured a series of stock loans.  Instead of

15   selling GENI shares in the open market, which would have depressed the stock's

16   price and reduced his profits, El-Batrawi and Ultimate Holdings, with the

17   participation of Breedon and Evanglista, improperly loaned millions of GENI

18   shares to unsuspecting broker-dealers.  The loans generated cash proceeds for the

19   full market value of the GENI shares and assured that El-Batrawi and Ultimate

20   Holdings would benefit from future price increases.

21       27.    The stock loans worked as follows.  El-Batrawi or Ultimate Holdings

22   loaned stock to a broker-dealer and received the current market value of the stock

23   in cash.  As GENI's stock price fluctuated, the loaned stock was "marked-to-

24   market" by the broker-dealer.  Ultimate Holdings received additional cash when

25   GENI's price increased, and was obligated to return cash when the stock price

26   dropped.  For example, if Ultimate Holdings loaned a broker-dealer 1,000 shares of

27   stock valued at $5.00 per share, Ultimate Holdings would get $5,000 from the

28   broker-dealer and the broker-dealer would take possession of the stock.  If the

1  price of the stock subsequently rose to $6.00 per share, Ultimate Holdings would

2  get another $1,000 from the broker-dealer.  If the stock then dropped to $4.00 per

3  share, Ultimate Holdings would be obligated to return $2,000 to the broker-dealer.

4      28.    By lending the shares rather than actually selling them, El-Batrawi

5  and Ultimate Holdings were able to profit by:  (i) obtaining substantial sums of

6  money in exchange for their stock without giving up control of the stock; (ii) profit

7  from the large increase in the market price for GENI that occurred following their

8  manipulative activities without having to sell their stock and thereby depress the

9  market price; (iii) generate funds that they could use to buy more GENI shares and

10 cause further price increases; and (iv) prevent the shares from being used for short

11 sales.

12 **El-Batrawi Hires D'Angelo to Arrange the Stock Loan Transactions**

13     29.    In the summer of 1999, El-Batrawi retained D'Angelo and his

14 company, RBF International, to facilitate loans of GENI stock to broker-dealers.

15     30.    Shortly thereafter, D'Angelo approached Breedon, a former RBF

16 International employee, to broker GENI stock loans with Breedon's then-current

17 firm, Deutsche Bank Canada.  At the time, Breedon was the head of Deutsche

18 Bank Canada's securities lending department.

19     31.    Breedon agreed to borrow GENI stock on behalf of Deutsche Bank

20 Canada from El-Batrawi and Ultimate Holdings.  However, he would not accept

21 the GENI stock directly from them because they were not broker-dealers.

22 Deutsche Bank Canada's policies prohibited loans from individuals and thus

23 Breedon could only borrow stock from a creditworthy broker-dealer.  To make it

24 appear that the stock was coming from a broker-dealer, D'Angelo and Breedon

25 interposed other broker-dealers between Deutsche Bank Canada and El-Batrawi

26 and Ultimate Holdings.

27     32.    D'Angelo first contacted Evanglista, the head of securities lending at

28 Native Nations, who agreed in October 1999 to accept delivery of the GENI shares

9

owned by El-Batrawi and Ultimate Holdings and then re-loan them to Deutsche Bank Canada. D'Angelo delivered the GENI shares to Native Nations for El-Batrawi and Ultimate Holdings. Evanglista then transferred the GENI shares to Deutsche Bank Canada in a second, but virtually simultaneous, stock loan transaction. In return, the current market value of the shares was paid in cash from Deutsche Bank Canada, through Native Nations, to El-Batrawi and Ultimate Holdings.

33.    The GENI shares were transferred under the transaction code "DVP" (i.e., delivery versus payment), indicating that Native Nations had purchased, not borrowed, the GENI stock. Evangelista, knowing that the policies and procedures of Native Nations prohibited stock loan transactions with non broker-dealers such as El-Batrawi and Ultimate Holdings, concealed the DVP coding by instructing a subordinate to falsify certain documents and record the transaction as a "stock borrow" from a large broker-dealer.

34.    From approximately October 1999 to August 2001, Evangelista at Native Nations continued to obtain and loan GENI shares in this manner. The amount of the loans grew (both because more shares were being loaned and because GENI's stock price was increasing dramatically) until Native Nations reached its credit limit with Deutsche Bank Canada. At that point, Native Nations could not continue as the direct counter-party to Deutsche Bank Canada for the GENI stock loans.

35.    To solve this problem, D'Angelo, Breedon, and Evanglista interposed a chain of stock lenders between El-Batrawi/Ultimate Holdings and Deutsche Bank Canada, arranging for El-Batrawi and Ultimate Holdings to provide GENI stock to Native Nations, which then loaned the stock to unsuspecting broker-dealers that continued re-loaning the stock until it ended up at Deutsche Bank Canada. The loan proceeds traveled in the opposite direction: from Deutsche Bank Canada through the various broker-dealers to Native Nations and ultimately to El-Batrawi

10

1 and Ultimate Holdings.  At one point, D'Angelo, Breedon, and Evanglista

2 interposed more than a dozen broker-dealers between Deutsche Bank Canada and

3 Native Nations.

4     36.     In order to conceal the fraudulent nature of the GENI stock loans,

5 Evangelista lied to Native Nations' counterparties about the source of the stock,

6 misled his supervisors about the true nature of the stock loans, violated Native

7 Nations' policies and procedures, and falsified Native Nations' books and records.

8     37.     Between September 1999 and September 2001, El-Batrawi and

9 Ultimate Holdings obtained more than $130 million in cash by loaning

10 approximately 15 million shares of GENI stock (about 65% of the float) to various

11 broker-dealers.  D'Angelo received significant fees from Ultimate Holdings for his

12 role in facilitating the stock loan scheme, and secretly compensated Evangelista

13 and Breedon for participating in the scheme.  Both Deutsche Bank Canada and

14 Native Nations received significant sums in interest payments from El-Batrawi and

15 Ultimate Holdings for the stock loans.  Breedon and Evanglista, in turn, received

16 compensation from their respective firms based in part on this interest income.

17     **The Stock Manipulation**

18     38.     With a mechanism for stock loans in place, Defendants engaged in a

19 variety of actions designed and intended to manipulate GENI's stock price upward.

20 For the stock loans to be successful, Defendants could not allow the stock price to

21 drop, because this would require El-Batrawi and Ultimate Holdings to return a

22 corresponding percentage of the cash collateral to the broker-dealers in the stock

23 loan chain.   On the other hand, by increasing the price of GENI's stock, El-

24 Batrawi and Ultimate Holdings received more cash collateral from the lending

25 chain.

26     39.     Accordingly, Defendants engaged in a series of manipulative practices

27 to maximize their ill-gotten gains from the stock loans by limiting the supply of

28 GENI shares in the marketplace while at the same time increasing the demand for

1  the stock. Among other things, they (i) took steps to limit the supply of GENI

2  stock and control the float, (ii) traded through nominee accounts to create the

3  illusion of demand, (iii) paid to have commentators tout GENI stock to the public

4  and potential investors; (iv) promoted a short squeeze without disclosing that they

5  were attempting to prevent their stock loans from unraveling; and (v) made false or

6  misleading statements or material omissions in public releases and filings with the

7  Commission.

8      40.    During the period that Defendants engaged in this scheme, despite

9  GENI's continual worsening financial performance and prospects, GENI's stock's

10  price increased from $1.67 per share (split adjusted) on September 1, 1999, to a

11  high of $25 per share on June 29, 2001, and thereafter remained at or above $17

12  per share until Defendants' scheme unraveled in September 2001.

13  **Defendants Limit the Supply of GENI Stock**

14      41.    In September of 1999, El-Batrawi himself owned 55% of GENI's

15  outstanding stock. Starting in February 2000, El-Batrawi began to purchase

16  additional GENI stock through Ultimate Holdings. By August of 2000, Ultimate

17  Holdings owned almost 1.4 million shares of GENI, or 22% of the shares

18  outstanding. Combined with the stock held directly in his name, El-Batrawi

19  controlled more than 75% of the outstanding float in GENI's stock by the summer

20  of 2000, and both El-Batrawi and Ultimate Holdings continued to buy.

21      42.    As part of the scheme, and in direct contravention to a normal stock

22  loan, Breedon caused Deutsche Bank Canada to forgo lending the GENI stock to

23  others and, instead, hold or "park" the millions of GENI shares it had borrowed

24  from El-Batrawi and Ultimate Holdings. Even after Deutsche Bank Canada began

25  to return shares of GENI stock to Native Nations in April 2001 to lessen its

26  exposure, Evangelista had Native Nations hold those shares, making them

27  unavailable to market participants.

28  ///

43.    Defendants further limited the supply of stock by using some of the proceeds from the stock loan scheme to buy more GENI shares in the open market. During 2000 and 2001, El-Batrawi purchased approximately 1.5 million shares of GENI stock for about $27 million.

44.    During the same period, El-Batrawi and/or Khashoggi caused Ultimate Holdings to buy over 5 million shares of GENI stock for approximately $80 million. Ultimate Holdings reported in its Schedules 13-D filed with the Commission that the source of the funds for its purchases were "working capital" and loans made in the ordinary course of business by Deutsche Bank pursuant to a line of credit. In fact, Ultimate Holdings had no working capital or line of credit with Deutsche Bank.

45.    By the end of 2000, El-Batrawi and Ultimate Holdings together owned approximately 18.6 million shares of GENI common stock, which constituted about 84% of the outstanding shares. During 2001, El-Batrawi and Ultimate Holdings bought even more shares and exercised stock options, increasing their aggregate holdings of GENI common stock to about 88% of the total shares outstanding. Most of those shares eventually ended up being "loaned" to Deutsche Bank Canada for cash.

46.    When El-Batrawi and Khashoggi wanted to sell a large block of GENI shares in order to raise funds, they typically did so by entering into a private sale with resale restrictions to ensure that the GENI stock would remain "parked" with the purchaser. Such a private sale of GENI shares was functionally equivalent to the stock loans, as El-Batrawi and/or Ultimate Holdings were able to receive cash for their GENI stock without increasing the publicly-available shares. El-Batrawi and/or Ultimate Holdings often then purchased more shares of GENI stock in the open market, further restricting the supply.

47.    For example, on July 6, 2001, Ultimate Holdings, at El-Batrawi's direction, sold 500,000 shares of GENI common stock to the Orbitex Fund in a

13

private sale.  The Orbitex Fund acquired the shares of GENI common stock at $14 per share (a 20% discount to the market price).  However, the shares were subject to resale restrictions designed to make it difficult for the Orbitex Fund to loan or re-sell the stock, including requirements that the Fund avoid trading if there was selling pressure in the market and agree not to sell the stock below $18 per share. Although Ultimate Holdings disclosed the sale of the stock to Orbitex on a Form 4 filed with the SEC on August 8, 2001, Ultimate Holdings did not disclose the resale restrictions and their potential effect on the publicly-available shares of GENI common stock.  In the month after the Orbitex transaction, Ultimate Holdings bought an additional 500,000 shares of GENI common stock in the open market, at prices ranging from approximately $17 to $18 per share.

48.    From about November 2000 through September 2001, El-Batrawi also worked to limit the supply of GENI stock by engaging in a campaign to convince GENI investors to participate in a "short squeeze."  During this period, an increasingly large number of investors had made short sales of GENI stock.  A "short sale" is a transaction in which an investor sells shares of a stock that he does not actually own.  An investor will sell a stock short if he expects its share price to decrease, at which time he can buy lower priced shares in the open market to "cover" the short sale and pocket the difference as profit.  Short sales create selling pressure, which can itself cause the share price to decrease.  Accordingly, the increasing number of short sales of GENI's common stock was pressing on its share price, creating a significant risk to Defendants' stock loan scheme.

49.    Often the broker-dealer which executes a short sale for an investor will have to borrow shares of that stock from other broker-dealers to deliver to the buyer of the shares.  Generally speaking, only shares that are in street name and in a margin account can be borrowed.  A tactic to combat an increase in short sales is for shareholders to place their shares into certificates in their name (as opposed to street name) and/or to move their shares from margin accounts to cash accounts.

14

1   This tactic is commonly referred to as a "short squeeze."

2       50.    In April 2001, El-Batrawi caused GENI to issue a public letter to

3   shareholders, which also appeared as an advertisement in the Wall Street Journal

4   and as a press release, asking GENI investors to take their stock out of margin

5   accounts and street name to prevent the shares from being borrowed for short sales.

6   El-Batrawi caused GENI to issue a similar letter in September 2001, again

7   encouraging shareholders to contact their brokers to take their shares out of street

8   name, put their shares into cash accounts, or obtain physical stock certificates to

9   prevent their shares from being borrowed for short sales.  However, El-Batrawi

10  failed to disclose to GENI's shareholders that he himself had already turned his

11  stock into cash through stock loans.  In essence, El-Batrawi, Khashoggi and

12  Ultimate Holdings were effectively selling their GENI shares (by shifting the risk

13  of market loss from themselves to the stock loan participants) while El-Batrawi

14  was advising unsuspecting GENI shareholders to hold their shares.  This tactic

15  diminished the risk to Defendants that they would lose the financial benefits they

16  had obtained through stock "loans" and increased the likelihood that GENI

17  shareholders would unwittingly hold their stock until it was worthless.

18          **Defendants Artificially Increase the Demand for GENI Stock**

19      51.    El-Batrawi and others also increased the demand for GENI's stock by

20  engaging stock "analysts" to tout GENI's prospects and by repeatedly buying and

21  selling GENI stock through Ultimate Holdings, El-Batrawi's accounts, and

22  nominee accounts to create the false appearance that GENI was an actively traded

23  and widely sought after security.

24      52.    In late December 1999, El-Batrawi engaged Courtney Smith, a well-

25  known financial commentator, to tout GENI on television.  In return, GENI

26  purchased a customer list owned by Smith for approximately $100,000 (although

27  Smith had never sold the list for more than $7,000 previously) and also bought a

28  website owned by Smith for approximately $1 million worth of GENI stock.  At

1 the time, the website had no revenue, no working model, no product, no customers

2 and no employees. In both cases, the transactions were done through

3 intermediaries so that Courtney Smith's name did not appear on the documents.

4     53.     On December 21, 1999, Courtney Smith began touting GENI, calling

5 the company "a very hot, speculative pick" and describing its core business as

6 "extremely profitable" on Bloomberg TV. In the days after this recommendation,

7 GENI's stock price rose 50% from $1.50 to $2.25, trading at 29 times its average

8 volume over the prior three months.

9     54.     Courtney Smith continued to tout GENI on television through April

10 2001. For instance, during a February 8 appearance on Bloomberg TV, he

11 described GENI as "exploding in revenues" and predicted that its share price

12 would rise 300-500%. The next day the stock rose 77%, from $2.21 to $3.92, on

13 24 times its average volume. On February 25, Courtney Smith recommended

14 GENI on CNBC, making the company his "Double Your Money Pick." In later

15 appearances, Smith said, among other things, that GENI is "exploding in

16 revenues," "its core business is extremely profitable" with a "PE ratio of

17 somewhere between 5 and 10 to 1," and its stock is "very cheap."

18     55.     El-Batrawi, Khashoggi, and others also drove up the price of the stock

19 by engaging in large numbers of buys and sells of GENI stock through their own

20 accounts and through the accounts of nominees. The buys and sells were often

21 done in small lots of 100 to 500 shares, amplifying the false appearance of general

22 investor interest. From about April 2000 through September 2001, this trading

23 activity constituted a substantial portion of the total trading volume in GENI stock.

24     56.     For instance, between April 2001 and September 2001, often at El-

25 Batrawi's direction, Ken D'Angelo placed thousands of trades with a total value of

26 more than $87 million. Many of these trades involved small lots of GENI shares,

27 typically between 100 to 1,000 shares, which greatly amplified the overall

28 appearance of investor interest in GENI shares.

57.    El-Batrawi and/or Khashoggi, working together, also traded in the various Ultimate Holdings accounts.  From approximately March 2001 through June 2001, Ultimate Holdings executed hundreds of buy and sell transactions involving GENI securities.  Similarly, in a series of transactions between late August and early September 2001, Ultimate Holdings, at Khashoggi's and/or El-Batrawi's direction, purchased 1.5 million shares of GENI, valued at $21 million.  On many days, this trading alone was sufficiently large enough to materially affect the GENI trading volume.

58.    Deutsche Bank taped scores of telephone conversations between D'Angelo and Breedon, during which these two Defendants discussed Defendants' efforts to manipulate and control of the price of GENI's shares through the massive buying and selling of the stock by D'Angelo, El-Batrawi and Ultimate Holdings. The following are excerpts from some of these conversations between D'Angelo and Breedon:

**Excerpt of conversation between Wayne Breedon and Ken D'Angelo (11/6/00)**

Breedon:    So how's Ramy Samy?

D'Angelo:    He seems fine.  I mean, you know, he, he seems like he's, I don't know, want to use the word right, focused.

Breedon:    Mm hmm.

D'Angelo:    To get everything done.  He's gonna push the stock up a quarter of a point or half a point every day.

**Excerpt of conversation between Wayne Breedon and Ken D'Angelo (9/6/01)**

Breedon:    Yes.  How's it going?  I saw the news.  Three to one.

D'Angelo:    Yeah.

Breedon:    Yeah, that boosted the stock a little bit.

D'Angelo:    Yep.  Now we gotta go from here.

Breedon:    Go from here.

D'Angelo:    He wants to get it up to eighteen today.

17

1    Breedon:    Oh yeah?

2    D'Angelo:   That'll help you out.

3    Breedon:    Yeah, eighteen is fine.

4    **Excerpt of conversation between Wayne Breedon and Ken D'Angelo (6/14/01)**

5    D'Angelo:   It was not a very good day today, Wayne.

6    Breedon:    Hmm.

7    D'Angelo:   Goodnight, Glen. This is not a good day, bud. 'Cause I got

8                maneuvers up the gazoo. 'Cause Ramy couldn't buy any stock

9                today. So I had to [expletive omitted] sit here. And get

10               [expletive omitted] pounded, you know. But, that's the way it

11               goes.

12   **Excerpt of conversation between Wayne Breedon and Ken D'Angelo (7/10/01)**

13   D'Angelo:   You can't even believe what I've done in the last week.

14   Breedon:    Yeah.

15   D'Angelo:   Did I tell ya what I've been doin? I'm the new guy supporting

16               the market.

17   Breedon:    Yeah.

18   D'Angelo:   I hadda buy close to two million dollars worth of stock over the

19               last four days and I had to have Freeman lend me two million

20               dollars because I had to send a check into Anthony for a million

21               eight plus. Without me doing that? Believe me, the stock

22               would have been fourteen dollars.

23   Breedon:    Why, why is it not . . .

24   D'Angelo:   Because he [El-Batrawi] can't keep buying into Ultimate

25               without reporting it. You know what I'm saying?

26   Breedon:    Yeah.

27   59.    El-Batrawi also worked to increase demand for GENI's stock through

28   his aforementioned campaign to convince the public to participate in a "short

18

squeeze" in the stock.  As part of the effort to increase the number of investors

willing to buy GENI shares (which had the collateral effects for Defendants of both

increasing the share price and limiting the supply of stock available to "cover"

existing short sales, thereby causing a scramble to buy an ever-diminishing supply

of GENI stock), El-Batrawi hired a stock promoter to produce two reports that

strongly recommended the stock due to the potential for a "short squeeze."

Further, El-Batrawi participated in a road show to promote GENI stock.  El-

Batrawi also hired a financial public relations firm which called investors and

brokers, telling them that GENI's stock was going to increase because of the

supposed "short squeeze."

### The Scheme Begins To Unravel

60.     To cover up the stock loans with El-Batrawi and Ultimate Holdings,

D'Angelo and Evanglista sent falsified audit confirmations to Native Nations'

auditors.  In connection with the 2000 audit of Native Nations' financial

statements, the auditors requested confirmation of certain loans involving GENI

stock from a large securities clearinghouse.  D'Angelo and Evanglista arranged for

false confirmations to be signed by individuals who were not associated with the

clearinghouse and then returned to the auditors.  In another instance, D'Angelo and

El-Batrawi tried, unsuccessfully, to convince one of the other brokers to sign a

confirmation letter falsely stating that his firm had loaned GENI shares to Native

Nations.

61.     During the fiscal 2000 audit, the auditor asked one broker-dealer to

confirm loans of GENI stock to Native Nations.  Because that broker-dealer's

records did not reflect such stock loans, the broker-dealer informed the head of

Native Nations of this discrepancy on February 13, 2001.

62.     Shortly thereafter, D'Angelo informed the head of Native Nations that

he had arranged the GENI stock loans and that Native Nations had actually

borrowed the stock from El-Batrawi, Khashoggi, and Ultimate Holdings.  During

19

1  his conversation with D'Angelo, the head of Native Nations demanded that
2  D'Angelo unwind the loans, but D'Angelo informed him that the transactions
3  could not be precipitously unwound.  To provide some protection to Native
4  Nations, the head of Native Nations then demanded that Ultimate Holdings execute
5  a master stock loan agreement with the firm.

6      63.    As a means of pressuring El-Batrawi to unwind the loans, the head of
7  Native Nations decided not to remit future cash payments to El-Batrawi,
8  Khashoggi, and Ultimate Holdings.  El-Batrawi began pressuring the head of
9  Native Nations to forward the cash.  El-Batrawi told the head of Native Nations
10 that he needed the money to cover loans he had outstanding and, further, that if he
11 did not get the cash, the shares would be loaned out and shorted, causing the stock
12 price to drop.

13     64.    On April 4 and 6, 2001, Native Nations transferred about $8 million
14 and $7 million, respectively.  The $15 million was used to pay off margin balances
15 in accounts owned by Ultimate Holdings, El-Batrawi and two of his nominees.

16     65.    From March to August 2001, GENI's stock price continued to rise.
17 El-Batrawi and D'Angelo continued to pressure the head of Native Nations to
18 release the additional cash that it had collected from its counterparties.  Native
19 Nations released millions of additional dollars to Ultimate Holdings, which was
20 used to inflate GENI's stock price.

21     66.    In late August 2001, El-Batrawi told the head of Native Nations that
22 he needed $17 million to meet margin calls.  On August 22, Native Nations
23 transferred $17 million to El-Batrawi on the express condition that $15 million
24 would be repaid to the firm in a few days.  These funds were not repaid.

25 **GENI's Stock Price Collapses And The Stock Loans Are Not Repaid**

26     67.    On September 10, 2001, GENI's stock price closed at $17.03 per
27 share.  On September 11, 2001, trading was halted in all U.S. markets after the
28 terrorist strikes.  When trading resumed on September 17, 2001, GENI's stock

20

1 price began falling precipitously.  On September 25, 2001, GENI closed at $5.90

2 and Nasdaq halted trading to obtain additional information from the company.

3 Instead of responding to the inquiry, GENI decided to voluntarily delist its stock.

4      68.    When GENI's stock price dropped in September, El-Batrawi and

5 Ultimate Holdings were obligated under the stock loan transactions to return the

6 cash that they had received from Native Nations, so that Native Nations could pay

7 the money to the other broker-dealers that had borrowed GENI shares.  Although

8 Native Nations made demands, El-Batrawi, Khashoggi and Ultimate Holdings

9 failed to repay any of the money.  As a result of its obligations to its counterparties,

10 Native Nations quickly exhausted its net capital and was forced out of business.

11 One of its counterparties was also forced out of business because it could not repay

12 downstream broker-dealers to which it had loaned GENI shares.  Numerous other

13 broker-dealers suffered losses in the tens of million of dollars as a result of

14 Defendants' scheme.

15      69.    The more than $130 million obtained by El-Batrawi and Ultimate

16 Holdings was used to purchase GENI stock, finance GENI's operations and enrich

17 El-Batrawi and Khashoggi.

18 **False Or Misleading Disclosures And Material Omissions**

19      70.    During the period relevant to this complaint, and in furtherance of the

20 fraudulent devices employed by Defendants and to avoid detection of the same,

21 GENI made false or misleading statements and/or omissions in releases to the

22 investing public and in filings with the Commission.  These filings were GENI's

23 Form 10-QSB for the quarter ended March 31, 2000, filed on May 15, 2000;

24 GENI's Form 10-QSB for the quarter ended June 30, 2000, filed on August 15,

25 2000; GENI's Form 10-QSB for the quarter ended September 30, 2000, filed on

26 November 14, 2000; and GENI's Form 10K for the year 2000 filed on April 16,

27 2001. Jacobson signed all these filings and El-Betrawi also signed GENI's Form

28 10K. Both participated in their drafting.

1    71.    On March 31, 2000, GENI issued a press release stating that it had

2    acquired a website called DoWebsites.com.  The press release failed to disclose

3    that GENI had indirectly purchased the website from Courtney Smith, who was

4    simultaneously touting GENI stock.  The press release also misleadingly described

5    the website as the leading portal for webmasters and the largest provider of tools

6    and resources for website developers.

7    72.    Despite this press release, GENI failed to record the website

8    transaction on its books during that fiscal quarter, or in the quarters ended June 30

9    and September 30, 2000.  Thus, GENI's quarterly reports filed with the

10    Commission, which were signed by Jacobson, were materially false and

11    misleading because such filings failed to reflect that GENI had incurred a $1.2

12    million expense and that GENI bought the website indirectly from Courtney Smith

13    while he was touting GENI stock.

14    73.    Jacobson was GENI's CFO at all relevant times.  He was responsible

15    for the books and records of the company, including the company's bank accounts

16    and brokerage records.  Jacobson was also a long-time associate of El-Batrawi and,

17    at the time, shared a house with him.  Jacobson knew or was reckless in not

18    knowing that by no later than the March 31, 2000 press release, GENI had

19    purchased the website.  However, he took no steps to have the company's books

20    reflect the purchase.  Jacobson also prepared and signed the company's quarterly

21    reports on Form 10-Q and took no steps to have these filings reflect the purchase.

22    74.    Between April 2000 and March 2001, GENI's auditors repeatedly

23    asked Jacobson to provide them with documentation supporting the website

24    acquisition.  Although Jacobson promised to deliver the supporting documentation,

25    he failed to do so.  It was not until April 2001 that the auditors finally obtained the

26    contract for the website acquisition and GENI recorded the website purchase on its

27    books.

28    / / /

75.    On April 16, 2001, GENI filed its Form 10-K for the year ended December 31, 2000, which El-Batrawi and Jacobson signed.  The annual report stated that:

> In April 2000, the Company purchased the assets of
> DoWebsites.com, Inc. for 72,000 shares of common stock
> valued at $1,224,000.  The principal asset purchased was
> goodwill.  The Company wrote off the goodwill
> established as a result of the acquisition of
> DoWebsites.com as the Company believes that the market
> for services offered by DoWebsites.com has decreased
> substantially due to the recent closures of many Internet
> related companies.

76.    The disclosure in GENI's annual report omitted material information concerning GENI's acquisition of, and accounting for, the website.  Specifically, the disclosure implied that the website had been a real asset worth $1.2 million in April 2000, but had become worthless by December 2000.  In fact, at the time the website was purchased in March 2000, GENI had conducted no objective evaluation as to the value.  Further, the disclosure also omitted that GENI had indirectly purchased the website from Courtney Smith while Smith was touting GENI stock.  The disclosure also failed to inform investors that GENI had not recorded the website transaction in prior quarters.

77.    In addition to the material omissions and misstatements regarding DoWebsites.com, GENI's annual and quarterly reports for 2000 contained material omissions about the company's relationship with its largest shareholder, Ultimate Holdings.  GENI did not disclose Ultimate Holdings' relationship with El-Batrawi, or El-Batrawi's continued control over Ultimate Holdings even after he purportedly transferred control of Ultimate Holdings to Khashoggi in November 2000.  Nor did the filings disclose that Ultimate Holdings was GENI's largest

23

1  creditor, and that Ultimate Holdings and/or El-Batrawi were propping up the

2  company by loaning GENI millions of dollars to meet its expenses.

3       78.    El-Batrawi knew or was reckless in not knowing that GENI's filings

4  omitted material information about Ultimate Holdings.  Jacobson, through his

5  control of the company bank accounts, his knowledge that the company had

6  received millions of dollars from Ultimate Holdings, and his close relationship

7  with El-Batrawi, also knew or was reckless in not knowing that GENI's filings

8  omitted material information about Ultimate Holdings.

9       79.    Ultimate Holdings also filed materially false and misleading

10  Schedules 13D with the Commission that misrepresented the source of the funds

11  for its purchases of GENI stock and failed to disclose the stock loans transactions,

12  as required by Item 6 in the Schedule 13D.

### FIRST CLAIM

**(Violations of Section 17(a) of the Securities Act and**

**Section 10(b) of the exchange Act and Rule 10b-5 thereunder)**

16       80.    Paragraphs 1 through 79 above are realleged and incorporated herein

17  by reference.

18       81.    Defendants El-Batrawi, Khashoggi, Ultimate Holdings, Breedon and

19  Evangelista knowingly or recklessly engaged in a fraudulent scheme to manipulate

20  the price of GENI stock.

21       82.    Additionally, Defendant GenesisIntermedia filed materially false and

22  misleading press releases and reports with the Commission.  Defendant El-Batrawi

23  knowingly or recklessly participated in the issuing of materially false and

24  misleading press releases and reports filed with the Commission.  Defendant

25  Jacobson knowingly or recklessly participated in the issuing of materially false and

26  misleading reports filed with the Commission.

27       83.    By reason of the foregoing, Defendants El-Batrawi, Khashoggi,

28  Ultimate Holdings, Breedon, Evangelista and Jacobson violated Section 17(a) of

1  the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5,

2  thereunder.

3  ## SECOND CLAIM

4  **(Violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act**

5  **and Rules 12b-20, 13a-1 and 13a-13, thereunder)**

6      84.    Paragraphs 1 through 79 above and realleged and incorporated herein

7  by reference.

8      85.    Defendant GenesisIntermedia, through the knowing and reckless

9  conduct of its agents, Defendants  El-Batrawi and Jacobson, filed false and

10  misleading reports with the Commission.

11      86.    By reason of the foregoing, defendant GenesisIntermedia violated

12  Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1 and

13  13a-13, thereunder.

14      87.    Defendants Ramy El-Betrawi and Douglas Jacobson knowingly

15  provided substantial assistance  to one or more of GenesisIntermedia's  violations

16  of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1

17  and 13a-13 thereunder.

18      88.    By reason of the foregoing,  and pursuant to Section 20(e) of the

19  Exchange Act, Defendants El-Betrawi and  Jacobson aided and abetted one or

20  more of GenesisIntermedia's violations of Sections 13(a) and 13(b)(2)(A) of the

21  Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

22  ## THIRD CLAIM

23  **(Violations of Section 13(d) of the Exchange Act**

24  **and Rules 13d-1and 13d-2)**

25      89.    Paragraphs 1 through 79 above are realleged and incorporated herein

26  by reference.

27      90.    Defendant Ultimate Holdings, through the conduct of Defendants El-

28  Betrawi and Khashoggi, knowingly included materially false information and

1  omitted required information in its filings with the Commission.

2       91.    By reason of the foregoing, defendant Ultimate Holdings violated

3  Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder.

4  **FOURTH CLAIM**

5  **(Violations of Exchange Act Section 13(b)(5) and Rules 13b2-1 and 13b2-2)**

6       92.    Paragraphs 1 through 79 above are realleged and incorporated herein

7  by reference.

8       93.    Defendants El-Betrawi and  Jacobson knowingly or recklessly

9  circumvented or failed to implement internal controls at GenesisIntermedia and

10  falsified the company's books and records.  Defendants El-Betrawi and Jacobson

11  also made false statements to the company's auditors and/or failed to provide

12  material information to the auditors in connection with the DoWebsites.com

13  transaction and the company's transactions and relationship with Ultimate

14  Holdings.

15       94.    By reason of the foregoing, Defendants El-Betrawi and Jacobson

16  violated Exchange Act Section 13(b)(5) and Rules 13b2-1 and 13b2-2 thereunder.

17  **PRAYER FOR RELIEF**

18       WHEREFORE, the Commission respectfully requests that this Court enter a

19  final judgment:

20       1.    against GenesisIntermedia, Inc.:

21            (i)    enjoining it from violating Section 17(a) of the Securities Act

22  [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange

23  Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)(A)] and Rules 10b-5, 12b-20,

24  13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-

25  13] thereunder;

26            (ii)    ordering it to produce to the Commission a written, specific,

27  sworn accounting of the disposition and present location of all the money it

28  obtained from the conduct alleged herein;

26

1    (iii) ordering it to disgorge the profits and proceeds it obtained as a

2 result of its actions alleged herein and to pay prejudgment interest thereon; and

3    (iv) ordering it to pay civil penalties pursuant to Section 20(d) of the

4 Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

5 U.S.C. § 78u(d)(3)];

6   2. against Ramy Y. El-Batrawi:

7    (i) enjoining him from violating Section 17(a) of the Securities Act

8 [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15

9 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R.

10 §§ 240.10b-5, 240.13b2-1 and 240.13b2-2] thereunder, and from aiding and

11 abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15

12 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 [17

13 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder;

14    (ii) ordering him to produce to the Commission a written, specific,

15 sworn accounting of the disposition and present location of all the money he

16 obtained from the conduct alleged herein;

17    (iii) ordering him to disgorge the profits and proceeds he obtained

18 as a result of his actions alleged herein and to pay prejudgment interest thereon;

19    (iv) ordering him to pay civil penalties pursuant to Section 20(d) of

20 the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

21 [15 U.S.C. § 78u(d)(3)]; and

22    (v) prohibiting him from serving as an officer or director of any

23 issuer having a class of securities registered with the Commission pursuant to

24 Section 12 of the Exchange Act [15 U.S.C. § 78l], any issuer required to file

25 reports with the Commission pursuant to Section 15(d) of the Exchange Act [15

26 U.S.C. § 78o(d)], or any issuer which has issued any security traded on any

27 national securities exchange or through any inter-dealer quotation medium;

28 / / /

1       3.     against Douglas E. Jacobson:

2          (i)     enjoining him from violating Section 17(a) of the Securities Act

3 [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15

4 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R.

5 §§ 240.10b-5, 240.13b2-1 and 240.13b2-2] thereunder, and from aiding and

6 abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15

7 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 [17

8 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder;

9          (ii)     ordering him to produce to the Commission a written, specific,

10 sworn accounting of the disposition and present location of all the money he

11 obtained from the conduct alleged herein;

12          (iii)    ordering him to disgorge the profits and proceeds he obtained

13 as a result of his actions alleged herein and to pay prejudgment interest thereon;

14          (iv)    ordering him to pay civil penalties pursuant to Section 20(d) of

15 the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

16 [15 U.S.C. § 78u(d)(3)]; and

17          (v)     prohibiting him from serving as an officer or director of any

18 issuer having a class of securities registered with the Commission pursuant to

19 Section 12 of the Exchange Act [15 U.S.C. § 78l], any issuer required to file

20 reports with the Commission pursuant to Section 15(d) of the Exchange Act [15

21 U.S.C. § 78o(d)], or any issuer which has issued any security traded on any

22 national securities exchange or through any inter-dealer quotation medium;

23       4.     against Ultimate Holdings, Ltd.:

24          (i)     enjoining it from violating Section 17(a) of the Securities Act

25 [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C.

26 § 78j(b)] and Rules 10b-5, 13d-1 and 13d-2 [17 C.F.R. §§240.105-5, 13d2-1 and

27 13d2-2-2] thereunder;

28 ///

1    (ii) ordering it to produce to the Commission a written, specific,

2 sworn accounting of the disposition and present location of all the money it

3 obtained from the conduct alleged herein;

4    (iii) ordering it to disgorge the profits and proceeds it obtained as a

5 result of its actions alleged herein and to pay prejudgment interest thereon; and

6    (iv) ordering it to pay civil penalties pursuant to Section 20(d) of the

7 Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

8 U.S.C. § 78u(d)(3)];

9  5. against Adnan M. Khashoggi:

10    (i) enjoining him from violating Section 17(a) of the Securities Act

11 [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

12 and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

13    (ii) ordering him to produce to the Commission a written, specific,

14 sworn accounting of the disposition and present location of all the money he

15 obtained from the conduct alleged herein;

16    (iii) ordering him to disgorge the profits and proceeds he obtained

17 as a result of his actions alleged herein and to pay prejudgment interest thereon;

18    (iv) ordering him to pay civil penalties pursuant to Section 20(d) of

19 the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

20 [15 U.S.C. § 78u(d)(3)]; and

21    (v) prohibiting him from serving as an officer or director of any

22 issuer having a class of securities registered with the Commission pursuant to

23 Section 12 of the Exchange Act [15 U.S.C. § 78l], any issuer required to file

24 reports with the Commission pursuant to Section 15(d) of the Exchange Act [15

25 U.S.C. § 78o(d)], or any issuer which has issued any security traded on any

26 national securities exchange or through any inter-dealer quotation medium;

27 ///

28 ///

29

1    5.    against Richard Joseph Evangelista:

2         (i)    enjoining him from violating Section 17(a) of the Securities Act

3    [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

4    and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

5         (ii)    ordering him to produce to the Commission a written, specific,

6    sworn accounting of the disposition and present location of all the money he

7    obtained from the conduct alleged herein;

8         (iii)    ordering him to disgorge the profits and proceeds he obtained

9    as a result of his actions alleged herein and to pay prejudgment interest thereon;

10   and

11        (iv)    ordering him to pay civil penalties pursuant to Section 20(d) of

12   the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

13   [15 U.S.C. § 78u(d)(3)]; and

14   6.    against Wayne Breedon:

15        (i)    enjoining him from violating Section 17(a) of the Securities Act

16   [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

17   and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

18        (ii)    ordering him to produce to the Commission a written, specific,

19   sworn accounting of the disposition and present location of all the money he

20   obtained from the conduct alleged herein;

21        (iii)    ordering him to disgorge the profits and proceeds he obtained

22   as a result of his actions alleged herein and to pay prejudgment interest thereon;

23   and

24   ///

25   ///

26   ///

27   ///

28   ///

1      (iv)    ordering him to pay civil penalties pursuant to Section 20(d) of

2  the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act

3  [15 U.S.C. § 78u(d)(3)]; and

4      7.    granting such other relief as this Court deems just and proper.

5

6  Dated:  April 13, 2006              Respectfully submitted,

7

8                          _John B Bulgozdy_

9                          John Bulgozdy (Local Counsel)
                           CA Bar No. 219897
10                         SECURITIES AND EXCHANGE COMMISSION
                           5670 Wilshire Boulevard, 11th Floor
11                         Los Angeles, CA 90036-3648
                           323.965.3322 (direct dial)
12                         323.965.3908 (facsimile)

13

14  Of Counsel:

15

16  Charles D. Stodghill
    Gregory N. Miller
17  Steven A. Susswein
    Attorneys for Plaintiff
18  SECURITIES AND EXCHANGE COMMISSION
19  100 F Street, N.E.
    Washington, D.C.  20549-4030
20

21

22

23

24

25

26

27

28

31