# EXHIBIT C

✎AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____Southern_____ District of _____New York_____

Ridge Clearing & Outsourcing
Solutions, Inc.    V.

**SUMMONS IN A CIVIL ACTION**

Adnan Khashoggi

CASE NUMBER: 07 Civ 6611 RJH
HP

TO: (Name and address of Defendant)

Adnan Khashoggi
104 Bd de la Croisette
Cannes, France

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Gail R. Zweig
Levi Lubarsky & Feigenbaum LLP
1185 Avenue of the Americas, 17th Fl.
New York, NY 10036

an answer to the amended complaint which is served on you with this summons, within the time remaining for response to the original complaint or within 10 days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

SEP 0 6 2007

CLERK    Marcos Quintero

DATE

(By) DEPUTY CLERK

AO 440  (Rev.  8/01)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served:

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐  Returned unexecuted:

☐  Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
　　　　　　　　　　　 Date                                    *Signature of Server*


_____
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Howard B. Levi (HB-7138)
Gail R. Zweig (GZ-3480)
LEVI LUBARSKY & FEIGENBAUM LLP
1185 Avenue of the Americas, 17th Floor
New York, New York 10036
Telephone: (212) 308-6100
Facsimile: (212) 308-8830

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RIDGE CLEARING & OUTSOURCING SOLUTIONS, INC. | : 07 Civ. 6611 (RJH)(HP) |
| Plaintiff, | : ECF CASE |
| - against - | : |
| ADNAN KHASHOGGI, | : **AMENDED COMPLAINT** |
| Defendant. | : |

Plaintiff Ridge Clearing & Outsourcing Solutions, Inc., by its attorneys, Levi Lubarsky & Feigenbaum LLP, for its Complaint against defendant Adnan Khashoggi, states as follows:

### NATURE OF THE CASE

1.     This is an action for breach of contract against defendant Adnan Khashoggi arising out of his misuse of his domination and control of Ultimate Holdings Ltd. ("Ultimate"), which caused a breach of the margin agreement that Khashoggi's alter-ego, Ultimate, had entered into with plaintiff in August 2001.

2.     Khashoggi, through his ownership and control of Ultimate, defrauded plaintiff as part of a scheme that he, Ramy Y. El-Batrawi ("El-Batrawi") and others engaged in

to manipulate the stock price of GenesisIntermedia, Inc. ("GENI"), a now-defunct public company.

3.    On information and belief, as part of the scheme, Khashoggi and others obtained millions of dollars by loaning approximately 15 million shares of GENI stock through various broker-dealers, by leading them to believe that the loaned GENI stock came from reputable brokerage firms and that the cash obtained through these loans was being used to remit to such other brokerage firms.  Instead, most of the money that the broker-dealers loaned in exchange for GENI stock ended up in the hands of El-Batrawi and Ultimate, whose actions Khashoggi and El-Batrawi were controlling.  Meanwhile, Khashoggi, El-Batrawi and others engaged in numerous fraudulent and deceptive practices to decrease the supply of GENI stock and increase the demand for the stock, and thereby inflate GENI's stock price, all with the intent and effect of ensuring that they pocketed the millions of dollars of cash collateral that had been transmitted through the broker-dealers from the GENI stock loan transactions.

4.    As it pertains to plaintiff, the stock manipulation scheme perpetrated by Khashoggi and others operated as follows:  In furtherance of the GENI stock manipulation scheme, in August 2001, Khashoggi caused Ultimate to enter into a margin agreement. Then, in August and early September 2001, Khashoggi caused Ultimate to make purchases of GENI stock through Ultimate's margin account with plaintiff.  Thereby, Khashoggi, El-Batrawi and others were able to maintain and/or further increase GENI's already fraudulently inflated stock price.

5.    After the scheme to fraudulently inflate GENI's price collapsed in late September 2001, GENI's stock price plunged, and Khashoggi and Ultimate defaulted on their obligations to repay plaintiff the money that they had fraudulently obtained by buying the GENI stock on margin.

6.    As a result of Ultimate's purchases of GENI stock, plaintiff made margin calls, and demanded payment of Ultimate's account debit balance, in accordance with the terms of the margin agreement.

7.    Khashoggi and El-Batrawi, in turn, made statements and promises, designed to conceal the stock manipulation scheme.

8.    Ultimate and Khashoggi have failed to make payment to plaintiff, despite it and Khashoggi's repeated promises to do so -- indeed, despite a promise to pay by a date certain, which has long ago passed.

9.    By orchestrating and carrying out the GENI stock manipulation scheme, and using Ultimate and the accounts Ultimate opened to further perpetrate the scheme and cause harm thereby to plaintiff, Khashoggi acted as Ultimate's alter-ego.  Khashoggi therefore is liable for the breach of the margin agreement that was occasioned by his misconduct, and plaintiff seeks a judgment of this Court which so directs.

## THE PARTIES

10.    Plaintiff Ridge Clearing & Outsourcing Solutions, Inc., successor-in-interest to U.S. Clearing, a division of Fleet Securities, Inc. (hereinafter "Ridge" or "plaintiff"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 26 Broadway, New York, New York 10004.  At all relevant times hereto, plaintiff was a broker-dealer registered with the New York Stock Exchange.

11.    Upon information and belief, defendant Adnan Khashoggi is a Saudi Arabian national who maintains a residence at 104 Bd de la Croisettete, Cannes, France.

3

## OTHER RELEVANT PERSONS AND ENTITIES

12.    Upon information and belief, Ultimate is a holding company that was organized under the laws of Bermuda and, at all relevant times hereto, had its principal place of business in Hamilton, Bermuda.

13.    At all relevant times hereto Ultimate was a privately-held investment holding company and, since at least as early as November 2000, Khashoggi has been the president, director and beneficial owner of Ultimate.

14.    At all relevant times hereto Ultimate was a customer of Adolph Komorsky Investments ("AKI"), and executed stock trades through AKI, which cleared through plaintiff. At all relevant times, plaintiff was AKI's clearing firm.

15.    El-Batrawi is a resident of Los Angeles, California.  Until October 2001, El-Batrawi was GENI's chief executive officer, president, chairman of the board, and majority shareholder.  On information and belief, between approximately September 1997 and November 2000, El-Batrawi was the president, director and sole shareholder of Ultimate.

## JURISDICTION AND VENUE

16.    Jurisdiction over defendant Khashoggi exists pursuant to 28 U.S.C. § 1332 in that the parties are of diverse citizenship.

17.    Venue over defendant Khashoggi is proper in this District pursuant to 28 U.S.C. §1391 in that a substantial part of the acts or omissions that give rise to this Complaint occurred in this District.

18.    The amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

## STATEMENT OF FACTS

**A.    Overview of The GENI Stock
Manipulation Scheme**

19.    On information and belief, the manipulation of GENI's stock price began shortly after the company's June 1999 public offering on the NASDAQ and continued through September 2001.

20.    On information and belief (and as alleged in a pending action by the United States Securities and Exchange Commission in which Khashoggi and Ultimate have defaulted), to benefit from the manipulation, Khashoggi, El-Batrawi and their cohorts structured a series of stock loans: Instead of selling GENI shares in the open market, which would have depressed the stock's price and reduced their profits, El-Batrawi and Ultimate, among others, improperly loaned millions of GENI shares to unsuspecting broker-dealers. The loans generated cash proceeds for the full market value of the GENI shares and assured that El-Batrawi and Ultimate would benefit from future price increases.  Khashoggi and El-Batrawi used Ultimate, in part, to effect these stock loans.   See Complaint filed by the United States Securities and Exchange Commission (the "SEC") on or about March 30, 2006, annexed hereto as Exhibit A.

21.    On information and belief, between September 1999 and September 2001, Khashoggi and El-Batrawi, acting together and through Ultimate, obtained more than $130 million in cash by loaning approximately 15 million shares of GENI stock (about 65% of the float) to various broker-dealers. See id. at ¶¶ 1, 37.

22.    On information and belief, the stock loans worked as follows: El-Batrawi or Ultimate loaned stock to a broker-dealer and received the current market value of the stock in cash. As GENI's stock price fluctuated, the loaned stock was "marked-to-market" by the broker-

dealer. Ultimate received additional cash when GENI's price increased, and was obligated to return cash when the stock price dropped. See id. at ¶ 27.

23.    On information and belief, once the mechanism for stock loans was in place, Khashoggi, El-Batrawi and others engaged in a variety of actions designed and intended to manipulate GENI's stock price upward. If the GENI stock were to drop, El-Batrawi and Ultimate would have been obligated to return a corresponding percentage of the cash collateral to the broker-dealers in the stock loan chain. Conversely, by increasing the price of GENI's stock, El-Batrawi and Khashoggi, acting through Ultimate, received more cash collateral from the lending chain. See id at ¶ 38.

24.    On information and belief, Khashoggi, El-Batrawi and others whom they recruited, engaged in a series of manipulative practices to maximize their ill-gotten gains from the stock loans. Among other things, they (i) took steps to limit the supply of GENI stock on the open market; (ii) traded GENI shares through nominee accounts to create the illusion of demand; (iii) paid to have commentators tout GENI stock to the public and potential investors; (iv) promoted a short squeeze without disclosing that they were attempting to prevent their stock loans from unraveling; and (v) made false or misleading statements or material omissions in public releases and filings with the SEC. See id at ¶ 2, 39.

25.    On information and belief, as part of the scheme to manipulate GENI's stock price, from approximately March 2001 through June 2001, Khashoggi, working with El-Batrawi, caused Ultimate to execute hundreds of buy and sell transactions involving GENI securities. See id at ¶ 57.

26.    On information and belief, in a series of transactions between late August and early September 2001, Ultimate, at Khashoggi's and/or El-Batrawi's direction, purchased

1.5 million shares of GENI, valued at $21 million. On many days, this trading alone was sufficiently large enough to materially affect the GENI trading volume. See id at ¶¶ 57.

27.    As described more fully below, the August and early September 2001 purchases of GENI shares by Ultimate were effected, in part, through the margin account that Khashoggi caused Ultimate to open with plaintiff in late August 2001, by which point in time Khashoggi was the sole beneficial owner of Ultimate.

**B.    Khashoggi Causes Ultimate To Open Its
    Margin Account With Plaintiff
    and Trade in GENI Shares to Further
    The GENI Stock Manipulation Scheme**

28.    On or about August 30, 2001, Khashoggi caused Ultimate to execute and deliver to AKI and Ridge a Margin Agreement in connection with the opening of a margin account (the "Margin Account"). On the account opening documents, Khashoggi was listed as Ultimate's beneficial owner. A copy of the executed Margin Agreement (together with a more legible copy of the form of margin agreement in blank), and account opening documents are annexed hereto as Exhibit B.

29.    Pursuant to the Margin Agreement, on or about August 28, 2001, Ultimate purchased on margin 146,300 shares of GENI, at a total cost of $2,546,756.46.

30.    Pursuant to the Margin Agreement, on or about August 29, 2001, Ultimate purchased on margin 100,300 shares of GENI at a total cost of $1,742,391.46.

31.    On or about August 30, 2001, Ultimate purchased and sold 192,300 shares of GENI for a net loss of $24,859.42.

32.    On or about August 31, 2001, Ultimate purchased 460,000 shares of GENI on a delivery versus payment basis at a total cost of $7,937,769.95. At Ultimate's request, on or about September 18, 2001, this purchase was transferred to the Margin Account prior to delivery

of the shares by Ridge to Ultimate and payment by Ultimate, which made the purchase a purchase on margin subject to the terms of the Margin Agreement.

33.    On or about September 4, 2001, Ultimate purchased 300,000 shares of GENI on a delivery versus payment basis at a total cost of $5,138,169.95.  At Ultimate's request, on or about September 18, 2001, this purchase was transferred to the Margin Account prior to delivery of the shares by Ridge to Ultimate and payment by Ultimate, which made the purchase a purchase on margin subject to the terms of the Margin Agreement.

34.    On or about September 5, 2001, Ultimate purchased 40,000 shares of GENI on a delivery versus payment basis at a total cost of $697,449.95.  At Ultimate's request, on or about September 18, 2001, this purchase was transferred to the Margin Account prior to delivery of the shares by Ridge to Ultimate and payment by Ultimate, which made the purchase a purchase on margin subject to the terms of the Margin Agreement.

35.    On or about September 6, 2001, Ultimate purchased 50,000 shares of GENI on a delivery versus payment basis at a total cost of $884,609.95.  At Ultimate's request, on or about September 18, 2001, this purchase was transferred to the Margin Account prior to delivery of the shares by Ridge to Ultimate and payment by Ultimate, which made the purchase a purchase on margin subject to the terms of the Margin Agreement.

36.    Pursuant to the Margin Agreement, on or about September 7, 2001, Ultimate purchased on margin 135,000 shares of GENI, at a total cost of $2,381,409.95.  Copies of the confirmations evidencing the purchases described in paragraphs 30 through 36 are annexed hereto as Exhibit C.

C.    **The Decline in GENI's Price**
      **And Suspension of Trading**

37.    As the confirmations annexed as Exhibit C disclose, the shares of GENI purchased on margin by Ultimate were purchased at prices between $17 and $18 per share.

38.    Ultimate delivered 225,000 shares of GENI into its Margin Account on August 29, 2001 and an additional 50,000 shares of GENI on September 10, 2001.

39.    After Ultimate's last purchase on September 7, 2001, and the closing of the securities markets between September 11 and 14, 2001, the price of GENI stock declined.

40.    On September 17, 2001, shares of GENI closed at $16.02 per share.

41.    On September 18, 2001, shares of GENI closed at $16.03 per share.

42.    Thereafter, the decline in the price of the stock accelerated, closing as follows:

| Date | Closing Price |
|------|---------------|
| 9/19/01 | $13.38 |
| 9/20/01 | $10.96 |
| 9/21/01 | $9.08 |
| 9/24/01 | $8.79 |
| 9/25/01 | $5.90 |

43.    On or about September 21, 2001, AKI caused 46,800 shares of GENI to be liquidated in the Ultimate margin account for net proceeds of $447,617.01.  A copy of the confirmation evidencing such sale is annexed hereto as Exhibit D.

44.    On September 25, 2001, NASDAQ halted trading in GENI shares.

45.    On or about January 29, 2002, trading resumed in GENI.  Ridge caused 5,500 shares of GENI to be liquidated in the Ultimate Margin Account at a price of 44 cents per share for net proceeds of $2,410.01.

46.    Subsequent to January 29, 2002, the price of GENI declined.  Between February 5 and February 14, 2002, Ridge caused an additional 153,200 shares of GENI to be liquidated in the Ultimate margin account at prices between 6 and 7 cents per share for net proceeds of $9,144.85.  Copies of the confirmations evidencing the sales described in paragraphs 45 and 46 are annexed hereto as Exhibit E.

47.    The price of GENI shares closed on February 28, 2002 at one cent per share and on March 29, 2002 at one-tenth of one cent per share.

## D.    Ultimate and Khashoggi's Failure to Meet Margin Calls and Demand For Payment

48.    Pursuant to the Margin Agreement, Ultimate agreed to "maintain such margins as you [Ridge] may in your discretion require from time to time and . . . at your request from time to time, deposit such collateral as may be required by the rules of any exchange or regulatory agency or as may be considered necessary or appropriate, in your discretion, to secure my obligations to you."  Exhibit B ¶ 5.

49.    Pursuant to the Margin Agreement, Ridge made margin calls on Ultimate on or about September 5, September 7, September 19 and September 21, 2001.  Copies of the communications evidencing these margin calls are annexed hereto as Exhibit F.[1]

50.    Ultimate failed to honor any of these margin calls.

---

[1]  The copy of the September 7 margin call letter bears the date October 2, 2001 because the copy was retrieved from the system utilized by Ridge on that date, and the system that generated the copy automatically dates the letter as of the date that the copy is generated.

51.     Pursuant to the Margin Agreement, Ultimate also agreed to "pay on demand any debit balance owing with respect to any of my accounts." Exhibit B ¶ 5.

52.     Ridge has made demand for payment on Ultimate and Khashoggi for the debit balance in Ultimate's account resulting from the above purchases of GENI shares.

53.     Ultimate and Khashoggi have failed to pay Ridge in accordance with Ridge's demand.

54.     As a result of Ultimate and Khashoggi's failure to pay Ridge in accordance with Ridge's demand, Ridge suffered damages in an amount not less than $20,894,245.22, together with interest and other costs and charges.

**E.     Khashoggi's Repeated Broken Promises**

55.     Ridge's officers participated in a conference call on or about September 20, 2001 with defendant Adnan Khashoggi, the beneficial owner of Ultimate.

56.     In that telephone conversation, Ridge's officers stated to Khashoggi that it was imperative that Ultimate make immediate payment to Ridge.

57.     In response, Khashoggi assured Ridge's officers that payment would be made by September 25, 2001.

58.     Notwithstanding that promise by Khashoggi, no payment was made by the promised date, or on any date thereafter.

59.     In that same September 20, 2001 telephone conversation, Khashoggi acknowledged that Ultimate owed to Ridge the sum of approximately $21.3 million in accordance with the terms of the Margin Agreement.

60.     In addition, on September 20, 2001, in an effort to conceal the GENI stock manipulation scheme that Khashoggi and El-Batrawi had implemented with others, El-Batrawi

opened a margin account with plaintiff, and El-Batrawi also executed a cross-guarantee of all of the transactions in which Ultimate had engaged through the Margin Account. A copy of the new account application and cross-guarantee are annexed hereto as Exhibit G.

61.    On or about September 27, 2001, Ridge became aware that Ultimate was having liquidity problems, and that defendant therefore may not be able to make payment to Ridge.

62.    On October 2, 2001, as a result of a telephone conversation between Ridge's officers and Khashoggi, an officer of RIDGE flew to London to meet with him to discuss payment of Ultimate's debt, which it had incurred as direct result of the GENI stock manipulation that Khashoggi had perpetrated and caused Ultimate, among others, to perpetrate.

63.    On October 3, 2001, Ridge's officer and another representative of Ridge met with Khashoggi in London. At that meeting, Khashoggi confirmed that he is the owner of Ultimate; confirmed that Ultimate was having liquidity problems and might not be able to make payment any time soon; and discussed possible alternatives for Khashoggi to cause Ultimate's debt to be paid.

64.    The discussions in London did not result in any payment of Ultimate's debt being made, although Khashoggi again confirmed his intention to pay the debt.

**F.    Khashoggi's Disregard of the Corporate Form**

65.    On information and belief, Khashoggi disregarded the corporate form of Ultimate.

66.    On information and belief, the trades that Khashoggi caused Ultimate to engage in through the Margin Account with Plaintiff were a part of Khashoggi's scheme to

artificially inflate the GENI stock, and pocket the cash that broker-dealers were transmitting to him, and others, through Ultimate.

67.    Such domination by Khashoggi of Ultimate was thus used to cause a wrong to plaintiff.  Indeed, when the GENI stock manipulation perpetrated by Khashoggi, El-Batrawi and others scheme collapsed in the wake of the events of September 11, 2001, plaintiff was left holding the worthless stock of GENI.

**G.    The SEC and Others Commence Actions
        Against Khashoggi, El-Batrawi and Others**

68.    As a result of the stock manipulation scheme and the losses it caused to so many, several class-action lawsuits were commenced against Khashoggi, El-Batrawi and others. In each of these lawsuits, Khashoggi and Ultimate defaulted.

69.    Further, the SEC commenced an investigation, which resulted in the SEC filing a complaint in 2006 alleging Khashoggi, El-Batrawi, and Ultimate's involvement in a scheme to defraud various broker-dealers through the stock-lending scheme described above. See Exhibit A.

## COUNT I

### (Breach of Contract)

70.    Plaintiff incorporates herein by reference as if fully set forth the allegations contained in paragraphs 1 through and including 69 hereof.

71.    Ultimate breached the Margin Agreement with plaintiff.

72.    From at least as early as November 2000, Khashoggi dominated and controlled the ownership of Ultimate.

13

73. Khashoggi used his dominion and control of Ultimate to cause Ultimate to open the Margin Account with plaintiff, and to engage in a series of stock transactions in the Margin Account, with the intent and effect of furthering the GENI stock manipulation scheme.

74. As a direct result of Khashoggi's misuse of his domination and control of Ultimate to effect the transactions in the Margin Account, and to thereby further the stock manipulation scheme, plaintiff has suffered damages in an amount not less than $20,894,245.22, together with interest and other costs and charges.

75. Having acted as Ultimate's alter ego in connection with all of Ultimate's acts with respect to the Margin Account, Khashoggi is obligated to pay for the damages he and Ultimate caused to plaintiff as a result of breach of contract.

WHEREFORE, Plaintiff prays that this Court enter its order, judgment and decree:

(a) ordering that Khashoggi is liable for all damages sustained by plaintiff as a result of his and Ultimate's breach of contract;

14

(b) ordering that defendant remit to plaintiff $20,894,245.22, together with interest and other costs and charges, which is the amount of damages sustained by plaintiff; and

(c) granting such other and further relief as may be just and proper.

Dated:  New York, New York
          September 6, 2007

LEVI LUBARSKY & FEIGENBAUM LLP

By:    _____
       Gail R. Zweig (GZ-3480)
       1185 Avenue of the Americas, 17th Floor
       New York, New York 10036
       (212) 308-6100

       Attorneys for Plaintiff Ridge Clearing &
       Outsourcing Solutions, Inc.

# EXHIBIT A

FILED

2006 APR 13  AM 11:06

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1  CHARLES D. STODGHILL, *pro hac vice*
   Email: stodghillc@sec.gov
2  GREGORY N. MILLER, *pro hac vice*
   Email: millerg@sec.gov
3  STEVEN A. SUSSWEIN, *pro hac vice*
   Email: sussweins@sec.gov
4  Securities and Exchange Commission
   Division of Enforcement
5  100 F Street, N.E.
   Washington, D.C. 20549
6  Telephone:  (202) 551-4443
   Facsimile:   (202) 772-9244
7
8  LOCAL COUNSEL
   JOHN B. BULGOZDY, Cal. Bar No. 219897
9  Email: bulgozdyj@sec.gov
   Securities and Exchange Commission
10 5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
11 Telephone:  (323) 965-3998
   Facsimile:   (323) 965-3908
12
13 Attorneys for Plaintiff Securities and Exchange Commission

14              UNITED STATES DISTRICT COURT

15            FOR THE CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. CV06-2247 MRP (RZx) |
| Plaintiff, | COMPLAINT |
| vs. | |
| RAMY Y. EL-BATRAWI, GENESISINTERMEDIA, INC., ULTIMATE HOLDINGS, LTD., ADNAN M. KHASHOGGI, RICHARD J. EVANGELISTA, WAYNE BREEDON, and DOUGLAS E. JACOBSON, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**NATURE OF THE ACTION**

1.       Between September 1999 and September 2001, Defendants Ramy Y. El-Batrawi and Adnan M. Khashoggi, with the participation of Defendants GenesisIntermedia, Inc. ("GENI"), Ultimate Holdings, Ltd, Richard J. Evanglista, Wayne Breedon and others, engaged in a scheme to manipulate the stock price of GENI, a now-defunct public company, and misappropriated more than $130 million in the process.  El-Batrawi and Khashoggi obtained virtually all of these funds by loaning approximately 15 million shares of GENI stock through Native Nations Securities, Inc. and other broker-dealers to Deutsche Bank Securities Limited ("Deutsche Bank Canada") in exchange for cash.  To facilitate these stock loans, Evangelista, Breedon, and others defrauded Native Nations, Deutsche Bank Canada, and the other broker-dealers by leading them to believe that the loaned shares of GENI stock came from reputable brokerage firms and that they were sending the cash collateral to such broker-dealers.  In fact, most of the stock came from El-Batrawi and Ultimate Holdings, Ltd., an offshore entity controlled by El-Batrawi and Khashoggi, and most of the money was sent to El-Batrawi and Ultimate Holdings.

2.       To inflate GENI's stock price, which had the effect of generating additional cash collateral from the broker-dealers under the stock loans, El-Batrawi, Khashoggi, Breedon, and Evanglista engaged in numerous fraudulent and deceptive practices to decrease the supply of GENI stock and increase the demand for the stock, including: (i) taking steps to reduce the supply of GENI stock and maintain control of the float; (ii) promoting a short squeeze without disclosing to GENI shareholders that El-Batrawi and Khashoggi already had effectively sold their stock through the stock loans and were attempting to prevent their stock loans from unraveling; (iii) secretly compensating a financial commentator to tout GENI on television to create demand for the stock; (iv) making false and misleading

1

1  statements in periodic reports filed with the Commission and in press releases

2  issued by the company (with the participation of GENI's chief financial officer,

3  Douglas E. Jacobson); and (v) making thousands of trades through nominee

4  accounts to create the false appearance of widespread investor interest in GENI.

5      3.     During the period of Defendants' manipulative conduct, GENI's stock

6  price increased approximately 1,400%, from a low of $1.67 per share (split

7  adjusted) on September 1, 1999 to a high of $25 per share on June 29, 2001. After

8  the scheme collapsed in September 2001, GENI's stock price plunged to pennies

9  per share and El-Batrawi, Khashoggi, and Ultimate Holdings defaulted on their

10  obligations to repay the money that they had fraudulently obtained from the stock

11  loans. Their default caused several broker-dealers to suffer losses on the stock

12  loans of over $130 million. Ultimately, Native Nations and MJK Clearing, Inc.

13  went out of business, and the Securities Investor Protection Corporation ("SIPC")

14  had to conduct the largest bailout in its history.

15      4.     By engaging in the conduct described above, (i) all Defendants,

16  directly or indirectly, violated the antifraud provisions of the federal securities

17  laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

18  U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934

19  ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

20  thereunder, (ii) GENI violated, directly or indirectly, and El-Batrawi and Jacobson

21  aided and abetted violations of the reporting and books and records provisions of

22  Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and

23  78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20,

24  240.13a-1 and 240.13a-13] thereunder, and (iii) El-Batrawi and Jacobson, directly

25  or indirectly, violated the internal controls and books and records provisions of

26  Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1

27  thereunder [17 C.F.R. §§ 240.13b2-1], and made false representations to, or

28  withheld material information from, GENI's auditors in violation of Rule 13b2-2