UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RIDGE CLEARING & OUTSOURCING
SOLUTIONS, INC.,

                         Plaintiff,

          -against-

ADNAN KHASHOGGI,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

07 Civ. 6611 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, U.S. District Judge:

      This opinion follows a three-day bench trial and post-trial briefing on a single issue: should defendant Adnan Khashoggi, the "beneficial owner" of Ultimate Holdings, Inc. ("Ultimate"), be held personally liable for a debt all agree Ultimate owes? The question turns on whether, and against whom, it is equitable to pierce the corporate veil in these circumstances. This opinion sets forth the Court's findings of fact and conclusions of law on the issue, pursuant to Fed. R. Civ. P. 52(a). To the extent any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law, and vice versa. As explained in greater depth below, the Court finds that plaintiff has established its claim against Khashoggi, and awards judgment accordingly.

## FINDINGS OF FACT[1]

### A.     The Parties

Plaintiff Ridge Clearing & Outsourcing Solutions, Inc. ("Ridge Clearing") is a

corporation organized and existing under the laws of New York.  In 2001, Ridge Clearing

was known as Fleet Securities, Inc.; at that time, one of its divisions was U.S. Clearing, a

broker-dealer registered with the New York Stock Exchange.  (Pltf. Exs. 290, 291, 303 at

2.)[2]  The principal function of the U.S. Clearing division was to clear securities trades

placed by customers of the brokerage firms with whom U.S. Clearing had contractual

relationships.  (Pltf. Ex. 300 at 1, 302 at 1.)

Defendant Adnan Khashoggi is a national of the Kingdom of Saudi Arabia.  (See

Khashoggi Dep. 16:11–12.)[3]

### B.     Subject Matter Jurisdiction and Venue

The Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1332(a) on the

basis of diversity of citizenship of the parties, because the parties are completely diverse

---

[1] These findings of fact are based on the record, reasonable inferences drawn from it,
assessment of credibility and demeanor, and resolution of any conflicts in the evidence.
Citations to exhibits and testimonial evidence indicate some but not necessarily all of the
evidence pertaining to a given finding.  The live testimony of most witnesses consisted
principally of cross-examination, since direct testimony was presented to the Court, prior
to trial, via sworn declaration.  Mitchell Mintz, Kenneth Brigley, Ralph D'Auge, Leslie
Quick, Mary Jepperson, Andrew Malec, and Ramy El-Batrawi presented in-court direct
testimony that supplemented their declarations.

[2] For simplicity's sake, the three entities will be referred to, collectively and individually
as circumstances warrant, as "plaintiff."

[3] Mr. Khashoggi did not appear at trial although the Court extended to him the
opportunity to testify from Europe by video.  (Tr. 248-50; 353-55.)

and the amount in controversy exceeds $75,000.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to plaintiff's claims took place in this district.

### C.      The Formation of Ultimate

The facts giving rise to this action begin not with Khashoggi but with his protege, Ramy El-Batrawi ("El-Batrawi").  (*See* El-Batrawi Dep. 36:20–25.)  El-Batrawi and Khashoggi first met in the late 1980s and later developed close personal and business ties.  (*Id.* 28:12–29:24; 30:11–15; 36:20–25; Tr. 352:12–14.)  In the early 1990s, the two worked on various business transactions together.  (*See* El-Batrawi Dep. 36:6–10; 215:4–14; 215:21–24.)

In 1997, El-Batrawi formed a company called Ultimate Holdings, Ltd. ("Ultimate").  (Tr. 258:7–10.)  Ultimate was incorporated in Bermuda, and Coson Corporate Services Ltd. ("Coson"), a Bermuda-based corporate administrative services company, was hired to manage it.  (*Id.* 258:7–10; Johnston-Simmons Dep. 27:13–22.)  Colette Johnston-Simmons (*née* Johnston), a Coson employee between March 1999 and 2001, performed corporate administrative work for Ultimate; she also served as the company's secretary.  (Johnston-Simmons Grand Jury Tr. 12:3–5; Johnston-Simmons Dep. 27:3–28:16.)  Another Coson employee, Ernest Morrison, served as a Director of Ultimate from at least mid-2000 through 2001.  (Tr. 305:1–4.)  Coson's services for the company included initiating securities trades, preparing SEC filings, wiring money, and opening and maintaining brokerage and bank accounts for Ultimate.  (Johnston-Simmons Grand Jury Tr. 28:7–21.)

El-Batrawi did not contribute any capital to Ultimate upon its formation.  (El-Batrawi Dep. 58: 22d – 59.i5.)  Coson held all outstanding shares as a nominee on behalf of Ultimate's beneficial owner.  (Johnston-Simmons Grand Jury Tr. 50:19–51:14.)  Corporate documents listed El-Batrawi as an officer and director and as the company's beneficial owner.  (El-Batrawi Dep. 53:2–23).

**D.     Khashoggi's Role at Ultimate**

Khashoggi initially held no formal position in Ultimate.  (Khashoggi Decl. ¶ 3.)  He played no direct role in capitalizing Ultimate, and claims he did not even know when the company was formed.  (*Id.* ¶¶ 3–4; El-Batrawi Dep. 36:13-19.)  El-Batrawi had discussed the idea of the company with him, and Khashoggi had okayed it.  (El-Batrawi Decl. ¶ 8.)

According to both El-Batrawi and Khashoggi, Ultimate existed to make money for Khashoggi.  (Khashoggi Decl. ¶ 3.)  El-Batrawi described Khashoggi as his long-time "mentor," (*see id.* ¶¶ 2–3; El-Batrawi Decl. ¶ 2), and said that during the 1990s he worked on deals with Khashoggi to "try[] to make him money."  (El-Batrawi Decl. ¶ 4; El-Batrawi Dep. 40:9–25.)  Both men paint Ultimate as that kind of arrangement: El-Batrawi formed the company, but Khashoggi was to reap the benefits.  (Tr. 258:11–13; Khashoggi Dep. 150:18–22.)  While El-Batrawi was idenfified as Ultimate's owner from 1997 to 2000, it seems that El-Batrawi always intended Khashoggi to be the sole owner with the power to control Ultimate, rather than the mere beneficiary of its success.  This much is clear from a conversation that occurred late in 2000 between Johnston-Simmons and El-Batrawi.  Prior to that call, El-Batrawi had asked Johnston-Simmons to send him a copy of Ultimate's list of directors and officers.  (Johnston-Simmons Grand Jury Tr.

4

55:7–19.)  When she did so, El-Batrawi called back "dismayed to find out that he was still a director and officer of the company."  (*Id.*)  He insisted that Khashoggi "should have been a director and officer of the company from inception and not him" (*id*), and asked Johnston-Simmons to "destroy the records to erase the fact that he [El-Batrawi] ever had anything to do with the company" (*id.* 56:21–24).  Eventually Khashoggi, El-Batrawi, Johnston-Simmons, and Morrison participated in a telephone conversation during which Khashoggi suggested, and all agreed, that he formally assume beneficial ownership of the company and that all authorizations come through him.  (*Id.* 60:18–61:15.)  Coson transferred ownership to Khashoggi.  (Johnston-Simmons Dep. 117:21–25; El-Batrawi Dep. 47:1–24; 58:4-12.)[4]  Then it began to require Khashoggi's authorization to execute transactions for Ultimate.  (Tr. 260:17–21; Johnston-Simmons Grand Jury Tr. 60–61.)

In practice, Khashoggi was hard to get in touch with, and El-Batrawi handled many day-to-day business activities.  When El-Batrawi needed Khashoggi's authorization to have Coson execute a transaction, he would call Khashoggi to explain the transaction, and Khashoggi would call Coson with instructions.  (Tr. 261:4-9.)  This, at least, was in theory how Coson executed transactions for Ultimate.  It is not clear how often Coson was actually able to obtain Khashoggi's authorization.  According to El-Batrawi's testimony at trial, it only reached Khashoggi "maybe two times" in the few months

---

[4] It is uncertain precisely how this occurred.  El-Batrawi testified at his deposition that there were no documents evidencing the terms of any transfer of ownership.  (El-Batrawi Dep. 58:9–12.)  But Johnston-Simmons testified that she helped put together a resolution appointing Khashoggi as a director, and drafted a petition to the Bermuda Monetary Authority to substitute Khashoggi as beneficial owner.  (Johnston-Simmons Grand Jury Tr. 63:10–22.)  There is no evidence that Khashoggi paid any consideration for ownership or ever made a capital contribution to Ultimate.  (REB Dep. 58 : 22 – 59 : 5.)

following October 2000.  (Tr. 261:5–22.)  The difficulty of communicating with

Khashoggi, who was often traveling, ultimately made the arrangement unworkable.  (Tr.

261:5-19.)  Finally, Khashoggi agreed to let El-Batrawi act as his "proxy" or "agent,"

which provided El-Batrawi with the authority to manage Ultimate Khashoggi's behalf.

(Tr. 262:20-263:22.)

Khashoggi does not dispute, however, that he continued to control the company in

the most basic sense: he owned it, and he had the right to direct its activities.  That fact is

perfectly consistent with Khashoggi's broad delegation of responsibility to El-Batrawi.

(*See, e.g.*, Tr. 298–99, 300.)

### E.    Ultimate's Business Activities

Ultimate may have engaged in some business early on in its corporate existence,

although what exactly it did before 2000 is unclear.  El-Batrawi testified that he worked

on "deals," and made "maybe half a million to a million dollars," but the parties offered

no evidence about the nature of those deals.  (El-Batrawi Dep 53:2–54:9.)  In 2000

Ultimate embarked on the business activity critical to this case—transactions involving a

company owned by El-Batrawi and called GenesisIntermedia ("GENI").

El-Batrawi had founded GENI in 1993, four years before forming Ultimate.  (El-

Batrawi Dep. 17:21–25).  In 1999, El-Batrawi took GENI public.  (*Id.* 17:10–11.)[5]  Soon

after that, he met a man named Kenneth D'Angelo, who worked at R.B.F. International

("RBF").  (Tr. 265:3–10.)  From D'Angelo, El-Batrawi learned of the potential to obtain

cash through stock loans.  He agreed to loan shares of GENI stock through RBF in

---

[5] Shares of GENI stock were publicly traded on the NASDAQ from June 1999 until
September 25, 2001, when NASDAQ halted trading in GENI shares.

exchange for cash collateral.  (El-Batrawi Dep. 124; Tr. 309; El-Batrawi Decl. ¶ 9.) [6]

With that collateral, El-Batrawi acquired more GENI stock, which he then lent in

exchange for more collateral, and so on.  In early 2000, Ultimate began to engage in the

same kinds of transactions: buying GENI stock, loaning it for cash, and buying more

stock.[7]  (*See* Johnston-Simmons Dep. 80:7–19.)  RBF's role was to find brokers who

wanted to borrow GENI stock and connect them to El-Batrawi and later to Ultimate.  (Tr.

169:7–13; 265:3–10).  As the value of GENI stock increased during 2000 and 2001, the

cash collateral held by the stock lenders was marked to market, giving Ultimate and El-

Batrawi additional cash.  Ultimate and El-Batrawi each made monthly rebate (interest)

payments to RBF for the use of the collateral.  (Tr. 169:24–17; 314:10–12.)

El-Batrawi testified that he believed that he was loaning stock through RBF

directly to Deutsche Bank.  (El-Batrawi Dep. 75, 124.)  In reality, RBF mainly sent the

---

[6] "Stock lending" or "securities lending" refers the lending of securities by one party to
another.  The lender puts up stock, typically to a broker who needs it to cover short
positions or for some other reason; the borrower posts collateral tied to the stock price;
and the lender earns a small fee.  *See* Jason Zweig, *Is Your Fund Pawning Shares At Your
Expense?*, Wall St. J., May 30, 2009, *available at*
http://online.wsj.com/article/SB124363555788367705.html.  When the collateral is in the
form of cash, the borrower receives a monthly rebate—akin to interest— from the stock
lender; the rebate is less than the income expected from the lender's reinvestment of the
cash collateral.  The collateral is periodically marked to market, so that if the price of the
stock rises, the borrower must post more cash, and if it falls, the lender must return cash.

This, at least, is the way things work for broker-dealers who lend stock.  Allowing
lenders to reinvest cash collateral carries some degree of risk, but that risk is reduced
when the lender is a broker-dealer registered with the SEC and subject to SEC regulations
on securities lending.  For other types of lenders, it is normal to require segregation of
collateral rather than reinvestment of it.  (Jepperson Stmt. at 9.)  Neither El-Batrawi nor
Ultimate was a registered broker-dealer (*id.*), and neither segregated cash collateral
obtained as a result of lending GENI stock.

[7] It appears that El-Batrawi and Khashoggi concealed from others the active role that El-
Batrawi played on behalf of Khashoggi in the joint purchase of GENI shares by Ultimate
and El-Batrawi himself.  *See* P. Ex. 101.

stock to a broker-dealer called Native Nations Securities Inc. ("Native Nations"), previously known as Freeman Securities.  Through RBF, Native Nations obtained GENI stock from Ultimate and supplied cash collateral in exchange.  In turn, it on-loaned the stock to other brokers, who in some cases on-loaned it to others, including Deutsche Bank.  (*See* Jepperson Stmt.)[8]

In 2000 and 2001, Ultimate received about $70 million in collateral on its GENI stock loans.  (Tr. 177.)  As plaintiff's expert, Mary Jepperson, shows in her report, this was used to buy more GENI stock.  (El-Batrawi Dep. 100–01l Jepperson Stmt. at 13.)[9]

El-Batrawi's explanation for these purchases – that GENI stock was "so undervalued" (El-Batrawi Dep. 66) strikes the Court as incredible.  Instead, circumstantial evidence points to Khashoggi's and El-Batrawi's manipulation of the price of GENI stock.  As another of plaintiff's experts points out, Khashoggi, through Ultimate, and El-Batrawi controlled approximately 80% of GENI stock between October 2000 to 2001 and they were able to exert sufficient control over the stock's limited float to generate a whopping 241% return (138% over benchmark) during this period.  (Malec Statement at 2-4.)  Of course, this apparent return was the result, at least in part, of Ultimate's and El-Batrawi's use of the cash received in the stock loan transactions to fund their buying program.  But the cash collateral provided to Ultimate and El-Batrawi

---

[8] The GENI loan transactions were falsely recorded on Native Nations' books as "DVP" transactions rather than as stock loans (*see* Jepperson Stmt. at 4), for reasons neither party explains.  "DVP" stands for "delivery versus payment" and is commonly used to signify a securities purchase rather than a securities loan transaction.  (*See* Jepperson Stmt. at 4 n.1.)  While this provides some evidence that certain individuals at Native Nations were engaging in fraudulent conduct, there is no evidence that Khashoggi or El-Batrawi knew the transactions had been inaccurately recorded as "DVP" on Native Nations' books.

[9] Some of the cash also went to GENI in the form of loans (Tr. 177, 185; El-Batrawi Dep. 101), and some Jepperson was not able to trace (Tr. 178).

in the stock loan transaction was subject to a segregation requirement in the Master

Securities Loan Agreement between Ultimate and Native Nations dated February 16,

2001.  Both Khashoggi and El-Batrawi claim they were unaware of any segregation

requirement but the Court does not credit this testimony in light of the written evidence

that Khashoggi received a copy of the agreement no later than June, 2001.  Needless to

say Khashoggi and El-Batrawi had no cash collateral available to unwind Ultimate's

stock loan transactions when Native Nations began demanding repayment in mid-2001.

(Jepperson Stmt. at 9-10.)  At this point Khashoggi began searching for prospective

investors willing to buy some of Ultimate's GENI stock (El-Batrawi Dep. 130–31, 153,

156–57).  Selling GENI shares would have given Ultimate the cash it needed to return

collateral to Native Nations.  But none of the potential deals went through.[10]

**F.     Ultimate's Connection to Plaintiff**

From November 2000 onward, Ultimate used a brokerage account with Adolph

Komorski Investments ("AKI"), to buy GENI stock and to pay periodic rebates to RBF

for the use of the cash collateral.  Bear Stearns acted as the clearing broker for AKI until

early 2001, when the plaintiff in this action agreed to take on that job.  (Brigley Stmt. at

4–5; Mintz Stmt. at 3.)  As the clearing firm for AKI, plaintiff handled "activities relating

to trades from the time a trade [was] placed until the trade [was] settled."  (Quick Stmt. at

2.)  These included "the matching of trades," and the "delivery or book entry of

securities, and acceptance of securities delivered into an account or payment for

---

[10] One of the proposals had Prince Alwaleed bin Talal, a member of the Saudi Royal Family, buy some of Ultimate's position in GENI through his company, Systems International.  (Khashoggi Decl. ¶ 15.)  According to Khashoggi, Prince Talal had agreed to the transaction, but the events of 9/11 sank the deal.  (*Id.* ¶ 16.)

securities delivered into an account." (Mintz Stmt. at 5.)  Thus when Ultimate placed an

order with AKI to buy GENI stock, plaintiff was responsible for clearing the trade.

(Brigley Stmt. at 2–3, 4.)  Plaintiff would pay the seller out of its own pocket; and

plaintiff would deliver the stock to Ultimate.  Ultimate would then owe plaintiff for the

stock.

      Ultimate placed both DVP trades and trades on margin with the plaintiff.  (*See id.*

at 4, 5.)  In a margin trade, clearing firms like plaintiff typically had to pay for the

securities when the trade was executed.  In a DVP trade, plaintiff became obligated to

pay for the securities when it received them from the seller.  (*Id.* at 12.)  "Delivery versus

payment"—that is, the clearing firm's delivery of the securities to the customer in

exchange for payment—was typically expected within three days of a trade's settling,

although it could take longer if plaintiff had not yet received the securities.  (Tr. 39:8–

19.)  If plaintiff had the securities and attempted to make delivery but payment was not

forthcoming, plaintiff had a few options: it could grant the customer an extension of time

to pay for the securities, or it could sell the securities in the open market to recover its

money. (*Id.* 40:3–15.)

      Buying stock on margin means buying stock using money borrowed from the

clearing firm.  (Mintz Stmt. at 6.)  There are typically collateral requirements for such

trades; in Ultimate's case, the margin trades were executed pursuant to an August 30,

2001 margin agreement between plaintiff and Ultimate.  (*See* Pltf.'s Exh. 180.)  That

agreement contained the following provision regarding collateral for margin trades:

> I will maintain such margins as you may in your discretion require from time to
> time and will pay on demand any debit balance owing with respect to any of my
> accounts and I will, at your request from time to time, deposit such additional
> collateral as may be required by the rules of any exchange or regulatory agency or

as may be considered necessary or appropriate, in your discretion, to secure my
obligations to you.

(*Id.* ¶ 5.)  Federal regulations in effect in 2001 required a purchaser of stock on margin to

"post at least 50 percent of the value of the trade as collateral to the account in which the

trade occurred no later than the settlement date."  (Mintz Stmt. at 10.)  In addition,

plaintiff had a policy that, after settlement of a margin trade, the customer must continue

to maintain at least 35 percent of the current market value of the securities as collateral in

its margin account.  (*Id.*)  For accounts with a concentration of more than 60 percent in a

single security, plaintiff usually asked the customer to maintain a higher percentage of

collateral; the precise amount varied.  (*Id.*)

Between August 28 and September 7, 2001, Ultimate made a series of  large

purchases of GENI stock through AKI.  On August 28, it bought 146,300 shares of GENI

on margin.  (Pltf.'s Exh. 4.)  On August 29, it bought another 100,300 shares of GENI on

margin.  (Pltf.'s Exh. 5.)  On September 7, it bought another 135,000 shares of GENI on

margin.  (Pltf.'s Exh. 7.)  Plaintiff paid for these securities when the trades were

executed.  (Mintz Stmt. at 14.)

Ultimate also made several purchases of GENI stock on a DVP basis, on August

31, September 4, September 5, and September 6 (460,000 shares, 300,000 shares, 40,000

shares, and 50,000 shares, respectively).  (Mintz Stmt. at 15; Pltf.'s Exh. 189.)  These

purchases were never paid for.[11]

---

[11] On September 18, at Ultimate's request, the plaintiff altered the nature of these
transactions by cancelling the four DVP trade orders in Ultimate's DVP account and
processing new trade confirmations showing the four orders in Ultimate's margin
account.[11]  (Mintz Stmt. at 16; Pltf.'s Exhs. 8, 21–23, 193–96.)

Neither Khashoggi or El-Batrawi offer any business reason for Ultimate's unusual purchases of GENI stock in August and September 2001.  Indeed, Ultimate had previously advised counsel that it wished "to reduce its overall investment in Genesis." (Pl. Ex. 101.)  Incredibly, Khashoggi stated that he had no idea why his company, Ultimate, had purchased over one million shares of GENI during this two-month period. These purchases came while Ultimate was under heavy pressure to return to Native Nations the cash collateral it had raised on its outstanding loans of GENI stock.  Indeed, Khashoggi's efforts to sell GENI stock to Prince Talal were designed to solve the problem that Ultimate did not have cash to return on its stock loan transactions. Ultimate's decision to buy more GENI stock only exacerbated Ultimate's severe cash shortage.  On the record before it, the Court concludes that the most compelling inference to be drawn is that Khashoggi and El-Batrawi were continuing to artificially inflate the price of GENI shares as any sudden drop in share price would could have spooked Prince Talal or other potential investors.

While Khashoggi may have hoped to fund Ultimate's manipulative purchases with new money provided by Prince Talal or, perhaps, Native Nations, it is equally clear that Ultimate in fact had insufficient cash to pay for the stock at the time it made the four purchases in question.  Thus plaintiff was ultimately at risk, and both Khashoggi and El-Batrawi were well aware of the fact that they had placed a large bet with someone else's money.

**G.**     **The Denouement**

On September 4, plaintiff's then-director of risk management, Kenneth Brigley, was reviewing AKI transactions for the previous few days when he discovered Ultimate's

DVP purchase of 460,000 shares of GENI stock, worth nearly $8 million.  Brigley learned that Ultimate had been engaging in GENI stock trades through AKI for some time.  (Brigley Stmt. at 6.)  Based on the high concentration of GENI stock in Ultimate's DVP and margin accounts, plaintiff raised the margin requirement in Ultimate's margin account to 65 percent; it notified Ultimate of the change on September 5.  (*Id.* at 6–7; Pltf.'s Exh. 55.)  On September 10, Ultimate transferred an additional 50,000 shares of GENI stock into its AKI margin account as collateral.  (Quick Stmt. at 5; Pltf.'s Exh. 189.)

On September 11, plaintiff first attempted delivery of the 460,000 shares of GENI stock that Ultimate had bought in a DVP trade.  (Quick Stmt. at 5.)  Additional unsuccessful attempts to deliver these and the other DVP shares followed.  As a result of the events of 9/11, U.S. stock markets were closed until September 17, and plaintiff's offices in Lower Manhattan were closed until September 24.  (Brigley Stmt. at 9.)  When the markets reopened, the price of GENI stock began a downward spiral.  On September 18, plaintiff contacted AKI to "press for payment."  (*Id.*)  It also began having internal discussions about whether to liquidate the GENI shares held in Ultimate's margin account to cover plaintiff's losses from Ultimate's failure to pay.  (*Id.*)  On September 19 and 21, plaintiff made two more unsuccessful margin calls to Ultimate.  (*See* Pltf.'s Exhs. 57 and 58.)  On September 20, plaintiff's CEO, Les Quick, and Brigley participated in a conference call with Khashoggi and El-Batrawi, during Khashoggi said he would get the money to plaintiff.  (Brigley Stmt. at 10.)  But the call ended poorly, with Quick demanding immediate payment and Khashoggi hanging up.

El-Batrawi reassured plaintiff that payment was forthcoming.  At Quick's or Brigley's request, he agreed to cross-guarantee the debt.  (Tr. 94–95; Def.'s Exh. 552.) And on September 20, he transferred 56,000 shares of GENI stock from one of his personal accounts to Ultimate's margin account as additional collateral.  (Tr. 96.)  The next day, plaintiff sold 46,800 shares of GENI stock, which offset in small part the loss plaintiff had already sustained as a result of Ultimate's trading activity.

Still concerned about the possibility that plaintiff would be unable to recoup the money Ultimate owed it, Quick arranged to meet with Khashoggi in London on October 3.  (Quick Stmt. at 8.)  At a series of meetings in London, Khashoggi acknowledged the debt but said he did not have the liquidity to pay it.  (*Id.*)  He did offer to provide securities and properties held in various countries as collateral, but Quick viewed this collateral as inadequate.  (Tr. 104–05.)  As Quick remembers it, Khashoggi, together with some associates from a firm called Aston Rothbury, proposed a solution that involved plaintiff's posting $50 to $60 million in cash in exchange for a $100 million letter of credit from Barclays Bank or Deutsche Bank.  (Quick Stmt. at 8.)  Quick rejected the deal, reasoning that it would put plaintiff at risk of even greater loss. (*See id.*)

September 25 came and went without Ultimate's making payment.  On September 25, NASDAQ halted trading in GENI stock and the stock price went almost to zero.  (Tr. 97.)  Plaintiff attempted to collect money from AKI for the debt, but by that point AKI was insolvent.  (Quick Stmt. 9.)  On October 25, 2001, AKI assigned its rights in the Ultimate and El-Batrawi accounts to plaintiff.  (*See* Pltf.'s Exh. 29.)  By the time plaintiff eventually executed additional sales of GENI stock in early 2002, the stock was basically worthless.  (*See* Pltf.'s Exhs. 13–19.)

With interest and less plaintiff's recovery from its sale of GENI stock in September 2001 and early 2002, Ultimate owes the plaintiff $20,903,006. (*See* D'Auge Stmt. at 6.)  That amount is not disputed.  (*See* Tr. 11.)

## CONCLUSIONS OF LAW[12]

All agree that Ultimate breached a contractual obligation to the plaintiff.  The question is whether plaintiff met its burden to prove (1) that Khashoggi dominated and controlled the corporation (2) to perpetuate a wrong on plaintiff.  Plaintiff has met its burden on both prongs.

### A.      Ultimate's Breach of Contract

To sustain a claim for breach of contract, plaintiff must prove four elements by a preponderance of the evidence: (1) the existence of an agreement, (2) performance of the contract by one party, (3) breach of contract by the other party, and (4) damages. *Freidman v. General Motors Corp.*, 721 F. Supp. 2d 218, 224-25 (S.D.N.Y. 2010).  The parties agree that Ultimate owes the plaintiff nearly $21 million stemming from its breach of a contract to pay for the purchase of GENI stock in late August and early September 2001.

Khashoggi has pleaded the affirmative defense of failure to mitigate damages.[13]
"A plaintiff in a contract case is required to take reasonable actions to minimize its

---

[12] The parties have agreed that New York law governs this dispute.  *See American Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

[13] Khashoggi's post-trial brief raises the issue that plaintiff failed to prove damages at trial.  This argument is puzzling, as Khashoggi's counsel openly admitted at trial that Ultimate's debt to plaintiff was nearly $21 million.  In any event, one of plaintiff's

damages.  But the defense of failure to mitigate requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages."  *Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.*, 10 F. Supp. 2d 345, 370 (S.D.N.Y. 1998) (Kaplan, J.).  Plaintiff undertook due diligence when it agreed to become AKI's clearing broker in 2001.  Moreover, plaintiff acted reasonably in deciding not to liquidate the GENI shares held in Ultimate's AKI accounts immediately after the stock market reopened on September 17, 2001.  At that time, plaintiff was still being given reassurances by Khashoggi and El-Batrawi that payment would be forthcoming.  By the time plaintiff realized otherwise, GENI stock was nearly valueless.

**B.      Agency**

Plaintiff seeks to pierce the veil against not El-Batrawi, who mostly ran Ultimate's daily affairs, but Khashoggi, the absentee owner who designated El-Batrawi as his "proxy."  To do so, it must show that El-Batrawi acted as Khashoggi's agent.[14]

An agency relationship depends on the existence of three elements: (1) "the manifestation by the principal that the agent shall act for him," (2) "the agent's acceptance of the undertaking," and (3) "the understanding of the parties that the

---

witnesses, Ralph D'Auge, testified as to the amount of damages that plaintiff sustained. Defendant's counsel was free to cross-examine D'Auge as to plaintiff's calculation of damages.  He did not do so.

[14] Defendant's post-trial brief opens by saying there is no authority for piercing the corporate veil against an individual based on actions his agent took.  (Def.'s Br. 3.)  But such authority does exist.  *See Jet Star Ents., Ltd. v. Soros*, No. 05-6585, 2006 WL 2270375, at *7 (S.D.N.Y. Aug. 9, 2006).  In addition, defendant's argument would make poor policy; if he were right, all corporate owners could shield themselves against personal liability from veil-piercing by delegating various actions to their agents.

principal is to be in control of the undertaking." *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (internal quotation marks omitted).  "[A]n agent must have authority, whether apparent, actual or implied, to bind his principal."  *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998).  In New York, actual authority exists where "the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly."  *Highland Capital Management LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010); *see Ford v. Unity Hosp.*, 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659, 664 (N.Y. 1973) ("An agent's power to bind his principal is coextensive with the principal's grant of authority.").

In this case, there is no dispute that, from at least October 2000 onward, Khashoggi was the beneficial owner of Ultimate.  (*See* Khashoggi Dep. 34–35.)  Nor is there any dispute that Khashoggi and El-Batrawi independently characterized El-Batrawi's role as that of "agent" and "proxy."  Khashoggi concedes that El-Batrawi was his agent, and simply seeks to avoid liability on the ground that he was not involved in the day-to-day operations of Ultimate—that El-Batrawi in effect ran the show.  But a broad delegation of authority to one's agent does not absolve the principal of liability. Khashoggi had the *right* to control El-Batrawi's actions; he had the right to veto El-Batrawi's transactions.  That he did not do so only demonstrates the extent to which responsibility was delegated to and vested in El-Batrawi.

This is not to say that Khashoggi was completely absent from Ultimate's operations throughout 2001.  To the contrary, by mid-2001 Khashoggi had become involved in a search to find cash for Ultimate to pay down its GENI stock loans.  And

Khashoggi met with Leslie Quick in London to discuss possible ways for Ultimate to repay plaintiff for the stock purchases of August and September 2001.  Khashoggi was not consistently part of Ultimate's daily business, but he played an active role in the company from mid-2001 onward.  And, after Ultimate's assets had been reduced to zero in late 2001 or early 2002, Khashoggi sold the shell company to a buyer for $10,000. (*See* Khashoggi Dep. 164, 169–70.)

For these reasons the Court concludes that El-Batrawi acted as Khashoggi's agent from late 2000 onward, and that El-Batrawi's actions on behalf of Ultimate are attributable to Khashoggi.

## C.    Piercing the Corporate Veil

Under New York law, a court may pierce the corporate veil where (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  Determining whether to pierce the corporate veil "is a very fact specific inquiry involving a multitude of factors."  *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 64 (2d Cir. 2001).  Veil-piercing is done with "extreme reluctan[ce]," and is reserved for cases where "the corporation primarily transacts the business of the dominating interest rather than its own."  *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000).

### 1.    Domination and Control

In determining whether an individual has dominated and controlled a corporation,

New York courts consider a number of factors, including

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) (citing *Wm.*

*Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.

1991).  Because "disregarding corporate separateness as an equitable remedy is one that

differs with the circumstances of each case," *American Protein Corp. v. AB Volvo*, 844

F.2d 56, 60 (2d Cir. 1988), no one factor or combination of factors is dispositive.

*Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 427 F. Supp. 2d 463, 488–

89 (S.D.N.Y. 2006).  "Domination is established not by such a bright-line test, but by

examination of the way a corporation functions—whether 'the owners use the

corporation as a mere device to further their personal rather than the corporate business.'"

*Federal Nat'l Mortgage Ass'n v. Olympia Mortgage Corp.*, 724 F. Supp. 2d 308, 319

(E.D.N.Y. July 7, 2010) (quoting *Morris v. New York State Dept. of Taxation and*

*Finance*, 82 N.Y.2d 135, 141 (1993)).

The facts underlying Ultimate's formation and business activities establish that

El-Batrawi, acting with Khashoggi's and as his agent, dominated and controlled Ultimate.

First, El-Batrawi demonstrated a disregard for certain corporate formalities.  Although Coson maintained corporate records for the company, the plaintiff's evidence indicates that these were far from sacrosanct.  In October 2000, El-Batrawi asked Coson to destroy records that indicated he, rather than Khashoggi, owned Ultimate.  (*See* Johnston-Simmons Grand Jury Dep. 56.)

Second, Ultimate was undercapitalized.  Ultimate's only significant assets were shares of GENI stock.  Defendant rightly notes that Ultimate's stake in GENI was worth more than $100 million before the price of GENI stock plummeted following 9/11, but that amount is doubling misleading because (a) GENI's share price was artificially inflated and (b) Ultimate simultaneously owed huge sums in cash collateral to Native Nations.  While Ultimate's assets on paper may have been large, it lacked the ability to pay its obligations to RBF and Native Nations, which were pressuring it to begin paying down the GENI stock loans.  *See* UNIF. FRAUDULENT TRANSFERS ACT § 2(b) (creating a presumption of insolvency for "a debtor who is generally not paying his [or her] debts as they become due"); WEBSTER'S NEW INT'L DICTIONARY 2488 (3d Ed. 1977) (defining undercapitalize as "to supply with insufficient capital for efficient operation").

Third, Khashoggi, and El-Batrawi acting as his agent, "exercised nearly unbridled discretion" over Ultimate's business activities, *see Atateks Foreign Trade Ltd. v. Private Label Sourcing*, LLC, No. 07-6665, 2009 WL 1803458, at *17 (S.D.N.Y. June 23, 2009).  The other officers of Ultimate were Coson employees who occupied essentially ministerial roles at the company.  As Khashoggi put it during his deposition, El-Batrawi and Khashoggi "direct our orders to [Johnston-Simmons], period," and "[w]hen I want to

transfer money to my account, I contact Collette Johnston, period."  (Khashoggi Dep. 98–99.)

Fourth, plaintiff established that Khashoggi acknowledged the debt owing to plaintiff and that he offered personal property in various countries as security.  (*See* Tr. 93, 107.)  Courts in New York have relied on such personal assurances as evidence of domination and control.  *See Hyland Meat Co., Inc. v. Tsagarakis*, 609 N.Y.S.2d 625, 626 (N.Y. App. Div. 1994) (specific assurances from partner to creditor that he would be paid for deliveries provided evidence that partner controlled the corporation and allowed for a finding that the partner was personally liable).

Fifth, Khashoggi, the dominant shareholder, transferred about $700,000 from Ultimate to his accounts and to those of his son and wife between October 2000 and December 2001.  (*See* Jepperson Stmt. at 19.)  While defendant rightly observes that the majority shareholder in a closely held corporation is entitled to dividends, Khashoggi did not testify that these were dividends, and the payments cannot fairly be characterized in that way.  A dividend is a surplus or share of profits distributed to shareholders; Khashoggi was taking money out of Ultimate as late as December of 2001—when Ultimate's assets, shares of GENI stock, were worth virtually nothing.  (*See id.*) Khashoggi never claimed that these payments were authorized by board resolution.  *Cf. Badian v. Elliott*, 165 Fed. Appx. 886, 889–90 (2d Cir. Jan. 23, 2006) ("In this case, the complaint adequately pleads the domination requirement by stating that, at the time of the charged breach, Elliott was capable of ordering the transfer of corporate assets without approval from the Board of Directors.").  And, although Khashoggi stated during his deposition that certain payments were made to reimburse him for corporate expenses—an

assertion the Court accepts in part—he did not provide a convincing explanation why multiple payments went directly to his wife and son.  The evidence suggests that Khashoggi made at least some personal use of Ultimate's funds, by transferring money to relatives.  Plaintiff overstates its case by describing transfers as "looting" and "siphoning off" funds; some were not.  Still, combining this with the other indicia of corporate domination, the Court readily concludes that Khashoggi controlled and dominated Ultimate.[15]

### 2.    Domination Used to Commit a Wrong

Proof of domination and control is insufficient on its own to justify piercing the veil.  Plaintiff must also establish that the defendant dominated and controlled the corporation in order to commit a wrong against the plaintiff that resulted in its injury.  A plaintiff is "not required to plead or prove actual fraud in order to pierce the corporate defendant's corporate veil," "only that the individual defendant's control of the corporate defendant was used to perpetrate a wrongful or unjust act toward plaintiff."  *Lederer v. King*, 625 N.Y.S.2d 149, 150 (1995); *see TNS Holdings, Inc. v. MKI Securities Corp.*, 92

---

[15] The Court's conclusion is buttressed by the fact that Khashoggi provided less than credible deposition testimony on a number of topics.  For example, Khashoggi said that he was unaware of stock loans relating to GENI, or that Ultimate was even purchasing GENI stock, when he became owner of Ultimate in October 2000.  (Khashoggi Dep. 40–41.)  But Khashoggi earlier said at the same deposition that the purpose of his taking ownership of Ultimate was to "channel[] the investment into, into Ultimate to invest in Genesis."  (*Id.* 35.)  At another point, Khashoggi stated that he did not learn of a problem with Ultimate's GENI stock until meeting Quick in London.  (*Id.* 59.)  But El-Batrawi testified that Khashoggi had known of the problem as early as mid-2000, which is why he began searching for individuals who would be willing to buy some GENI stock from Ultimate.  And Quick testified that he had spoken with Khashoggi on the phone about the problem prior to meeting him in London—the call that ended with Khashoggi hanging up in anger.

N.Y.2d 335, 339 (1998) (domination must have been "the instrument of fraud or otherwise resulted in wrongful or inequitable consequences"); *Studley, Inc. v. Lefrak*, 48 N.Y.2d 954, 956 (1979) ("Although proof of fraud is relevant in such a suit it is not essential."). But plaintiff bears the burden to establish that the domination and control proximately caused the wrong. *Freeman*, 119 F.3d at 1053 (explaining that "[u]nless the control is utilized to perpetrate a fraud or other wrong, limited liability will prevail"); *see Harrison-Hoge Industries, Inc. v. Panther Martin S.R.L.*, No. 05-2851, 2008 WL 905892, at *40 (E.D.N.Y. Mar. 31, 2008) (explaining that the party seeking to pierce the corporate veil "must establish that the parent corporation misused the corporate form . . . to commit a fraud or avoid an obligation") (internal citation omitted); *Rays Trading (H.K.) Co. Ltd. v. Judy-Philippine, Inc.*, No. 98-0170, 1998 WL 355422, at *4 (S.D.N.Y. July 2, 1998) (Koeltl, J.) (denying efforts to pierce the corporate veil, despite allegations of fraud, because there was "no indication that the corporate form itself was used as the means to commit the wrongs allegedly performed.").

The evidence before the Court amply establishes that Khasoggi used his domination of Ultimate to perpetrate a wrong on plaintiff. Plaintiff cleared over $20 million in GENI stock purchases by Ultimate/Khashoggi at a time when Ultimate had no cash to pay for the stock. Ultimate was severely undercapitalized from its inception as neither Khashoggi or El-Batrawi personally contributed any capital to Ultimate. While Ultimate did own a large illiquid stake in GENI, most of these shares were tied up in the stock loan chain which Native Nations was demanding be unwound. And, as noted, the value of unencumbered shares was being inflated by Ultimate and El-Batrawi's joint buying program. Khashoggi and El-Batrawi undoubtedly hoped that Prince Tal would

ride in as a white knight, but this investment never materialized and the proceeds were promised to Native Nations in any event.  Perhaps Khashoggi also hoped that Native Nations would be coerced into additional stock loan transactions to keep the house of cards upright.  But hope is a poor substitute for capital and Khashoggi must have known that Ultimate was undercapitzalized—indeed, likely insolvent—at the time plaintiff cleared Ultimate's stock transactions in August—September of 2001.

In deciding whether to pierce the veil—an extraordinary remedy reserved for circumstances where equity demand it—the Court is obligated to determine whether a person's domination and control of a corporation was the proximate cause of a wrong to plaintiff.  Here, the plaintiff has established proximate cause by a preponderance of the evidence.  Khashoggi, together with El-Batrawi, used Ultimate as a conduit to manipulate the market price of GENI stock and prop up their investment in GENI while they searched for an exit strategy.  Ultimate's stock purchases in August and September 2001 were the last wrongful step in that strategy and directly caused plaintiff's losses.

## CONCLUSION

For the foregoing reasons, judgment is awarded to plaintiff.  The Clerk of the Court is requested to close this case.

SO ORDERED.

Dated: New York, New York
       August 12 2011

_____
Richard J. Holwell
United States District Judge