UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RIDGE CLEARING & OUTSOURCING
SOLUTIONS, INC.,

                        Plaintiff,

         -against-

ADNAN KHASHOGGI,

                      Defendant.

07 Civ. 6611 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, U.S. District Judge:

      At trial Khashoggi's counsel moved to strike in part the reports and testimony of plaintiff's two expert witnesses, Mary Jepperson and Andrew Malec. Defense counsel argued that the two were not rendering expert opinions as required by Fed. R. Evid. 702. The Court took notice of the motions and stated that it would resolve them following trial should the expert opinions be material to the Court's decision. Having now reviewed the expert reports and the trial testimony, the Court is persuaded that the motions to strike should be granted in part and denied in part.

**I.    Standard**

      Fed. R. Evid. 702 governs the admissibility of expert testimony in federal court. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Before permitting a person to testify as an "expert" under Rule 702, a district court must make determine whether (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will assist the trier of fact.  *See Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005).  First, "[t]o determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Second, to decide whether a proffered expert opinion has the required indicia of reliability, courts apply the non-exhaustive list of factors identified by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993): whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation.  *See Daubert*, 509 U.S. at 593–94.  In addition, reliability requires a "sufficiently rigorous analytical connection between that methodology and the expert's conclusions."  *Nimely*, 414 F.3d at 396; *see General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Finally, Rule 702 requires the district court to decide whether the expert's testimony as to a particular matter will "assist the trier of fact." Fed. R. Evid. 702.  Expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), does not "aid the jury in making a decision."  Instead, it "undertakes to tell the jury what result to reach" and thus "attempts to substitute the expert's judgment for the jury's."  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

## II.   Mary Jepperson's Report and Testimony

Khashoggi does not dispute, and the Court concludes, that Jepperson is qualified to testify.  She has offered similar types of analysis in the past, including in another action relating to the GENI stock loan chain underlying this case. (*See* Jepperson Stmt. at 2 ¶ 1.)  Khashoggi's core objection, instead, is that Jepperson has rendered no expert opinion, choosing instead to recapitulate facts, some of which are already in evidence and some of which are not.[1]  The objection has some merit.  Much of the report is addressed to whether Khashoggi controlled Ultimate.  (*See* Jepperson Stmt., "Stock Loan Chain Activity," ¶¶ 10–26, 35; "Cash Tracing," ¶¶ 25–30.)  Part of it concerns El-Batrawi's understanding of how the GENI stock loans worked. (*See* Jepperson Report, "Stock Loan Chain Activity," ¶ 32.)  Some sections seem to be little more than an attempt to put facts into the record that were not admitted elsewhere. (*See id.* ¶ 21 (citing deposition testimony of Kenneth D'Angelo, whose deposition plaintiff agreed would not come into evidence, *see* Tr. 255).)  At least one of the report's conclusions concerns simple factual matters that do not require the aid of specialized expertise.  (*See* Jepperson Stmt.,

---

[1] Khashoggi concedes the admissibility of one aspect of the report—the record of payments from Ultimate to Khashoggi and members of Khashoggi's family.  (Tr. 125:21–126:9.)

"Conclusions," ¶ 1.) The report concludes that Khashoggi became the president of Ultimate; that he began to authorize Ultimate transactions in late 2000; and that he participated in various business activities on behalf of Ultimate in 2001. (*Id.* ¶ 1.) These facts are not in dispute; even if they were, a layperson could easily make these findings without the need to resort to expert testimony. Simply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (Gorenstein, M.J.) ("While an expert must of course rely on facts or data in formulating an expert opinion, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.") (internal citation omitted); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (Kaplan, J.) (rejecting portions of expert's testimony that was "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence"); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 WL 1585551, at *1–*2 (S.D.N.Y. July 16, 2002) (where expert's report was based on a review of, among other things, "documents, computer documents, computer files, deposition transcripts and exhibits," the "testimony by fact witnesses familiar with those documents would be far more appropriate . . . and renders [the expert witness'] secondhand knowledge unnecessary for the edification of the jury") (citation and internal quotation marks omitted) (alterations in original). Accordingly, the following paragraphs of Jepperson's report are stricken: ¶¶ 10–26, 32, and 35 of the "Stock Loan Chain Activity" section; ¶¶ 25–30 of the "Cash Tracing" section; and ¶ 1 of the "Conclusions" section.

Still, Jepperson's report is not wholly deficient. Jepperson and PriceWaterhouseCoopers traced the flow of cash to and from Ultimate and El-Batrawi and were able to determine that

Khashoggi had directed payments from Ultimate to himself and to his family.  (Jepperson Stmt., "Cash Tracing," ¶¶ 1–24; "Conclusions," ¶ 2.)  In the same vein, Jepperson properly rendered an opinion about where Ultimate's cash collateral went, and how quickly it was disbursed.  (*See* Jepperson Stmt., "Conclusions," ¶ 5.)  Moreover, the report opined that Ultimate's and El-Batrawi's failure to segregate collateral would have been highly unusual for a non-broker-dealer, and therefore unexpected to the counterparties to the transactions—the borrowers of GENI stock—who would have assumed that the stock was coming from registered broker-dealers.  (*See* Jepperson Stmt., "Stock Loan Chain Activity," ¶¶ 1–9, 27–31, 33–34, 36–44; "Conclusions," ¶ 3.)  This was properly a topic for expert testimony.  The same goes for Jepperson's opinion that it was inaccurate for Ultimate's SEC disclosures to describe the stock loans as made by Deutsche Bank to Ultimate in the ordinary course of business in connection with an open-ended line of credit.  (*See* Jepperson Stmt., "Stock Loan Chain Activity," ¶ 34; "Conclusions," ¶ 4.)  Khashoggi's motion is denied as to these opinions.

**III.    Andrew Malec**

Khashoggi's counsel also moved to strike "at least significant portions" of Malec's expert report.  (Tr. 192:22–24.)  He did not specify which portions or on what basis.  In his report and at trial, Malec opined that loaning stock, as opposed to selling it in the open market, "avoids downward price pressure on the stock" by "maintain[ing] the supply of shares in the marketplace."  (Malec Stmt. at 2.)  He further opined that Ultimate's ownership of GENI stock, as a percentage of total GENI stock outstanding, increased dramatically between October 2000 and June 2001 and that Ultimate and El-Batrawi together owned during the relevant period 80% of GENI shares which reduced the "float" of freely traded shares in the marketplace and put upward pressure on GENI stock price.  During that period, Malec calculated that GENI stock

generated a return of 241%, or 138% over the benchmark return. (*Id.* at 3–4.) These opinions contain the indicia of reliability that *Daubert* requires. Malec purportedly renders two other opinions in his report: (1) that Khashoggi "was active in negotiating private sales of GENI shares held by [Ultimate]," which would have "resulted in [Ultimate's] receiving cash for its GENI stock without increasing the number of freely-traded shares"; and (2) that a television commentator "touted GENI's stock" to keep the price artificially inflated. (*Id.* at 4–5.) But these are simply factual allegations repackaged as expert opinions. The allegations are not in evidence; they are apparently drawn from the deposition testimony of Kenneth D'Angelo, which was not admitted at trial. (*See* Tr. 255:8–15.) Accordingly, these two sections of Malec's report are stricken.

## CONCLUSION

For the foregoing reasons, Khashoggi's motions to strike are granted in part and denied in part.

SO ORDERED.

Dated: New York, New York
August 12, 2011

_____
Richard J. Holwell
United States District Judge